# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| ANVIL TRUST, *by its Trustee* )<br>Neil Richardson )<br>16 Kensington Gate, London )<br>W8 5NA England )<br> )<br>STEPHEN CANNON )<br>226-232 Argyle St, Apt 14/A )<br>Kowloon, Hong Kong SAR )<br> )<br>BRYANT EDWARDS )<br>57-61 Mortimer Street, Office 209 )<br>London W1W 8HS )<br> )<br>and )<br> )<br>NEIL RICHARDSON )<br>16 Kensington Gate, London )<br>W8 5NA England, )<br>*Plaintiffs*, )<br>v. )<br> )<br>ERNST & YOUNG )<br>10th Floor, East Tower )<br>Bahrain World Trade Center )<br>Manama, 140, Bahrain )<br> )<br>ERNST & YOUNG MIDDLE EAST )<br>10th Floor, East Tower )<br>Bahrain World Trade Center )<br>Manama, 140, Bahrain )<br> )<br>ERNST & YOUNG MIDDLE EAST )<br>(ABU DHABI BRANCH) )<br>Nation Towers, Tower 2 )<br>Corniche Road West )<br>Abu Dhabi, 136, United Arab Emirates )<br> )<br>ERNST & YOUNG JOHN DOE 1 )<br> )<br>ERNST & YOUNG JOHN DOE 2 )<br> )<br> | <u>**Civil Action No. 24-9731**</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

|                                        |     |
| -------------------------------------- | --- |
|                                        | )   |
| and                                    | )   |
|                                        | )   |
| ANTHONY O'SULLIVAN                     | )   |
| Nation Towers, Tower 2                 | )   |
| Corniche Road West                     | )   |
| Abu Dhabi, 136, United Arab Emirates,  | )   |
|                                        | )   |
| *Defendants.*                          | )   |
|                                        | )   |

## COMPLAINT FOR DAMAGES

Plaintiffs Anvil Trust, Stephen Cannon, Bryant Edwards, and Neil Richardson ("Plaintiffs"), by and through undersigned counsel, bring this action against Defendant Ernst & Young, Ernst & Young Middle East (Abu Dhabi Branch), Ernst & Young Middle East, Ernst & Young John Doe 1, Ernst & Young John Doe 2, and Anthony O'Sullivan (collectively, the "EY Defendants") for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for fraud.

## NATURE OF THE ALLEGATIONS

1.     This case arises from Ernst & Young's pivotal role in a years' long scheme to help Brooge Petroleum and Gas Investment Company FZE ("Brooge" or the "Company") to defraud investors in a 2019 U.S. Special Purpose Acquisition Company (or "SPAC") merger transaction.[1] Brooge was at all relevant times an oil-storage leasing company in Fujairah, United Arab Emirates.

---

[1] Unless otherwise stated, "Brooge" and the "Company" refer to Brooge Petroleum and Gas Investment Company FZE and Brooge Holdings Ltd., collectively, before the U.S. SPAC merger transaction, and Brooge Energy Limited f/k/a Brooge Holdings Limited, the surviving entity, after the U.S. SPAC merger transaction.

2.      In late 2018, a group of investors in a NASDAQ-listed SPAC—including Plaintiffs—was introduced to Brooge, and the parties executed a merger agreement in anticipation of a planned December 2019 merger between Brooge and the SPAC.

3.      The fundamental financial picture presented by Brooge to Plaintiffs was a fraud: in fact, Brooge fabricated between 30% and 80% of its 2018, 2019, and 2020 revenues.  To do this, Brooge undertook a fake invoicing scheme in which it prepared fraudulent invoices for fake customers who never paid.  To cover up the fraud, Brooge received checks from an affiliated party in amounts equal to the invoiced amounts—but then sent that money right back to the affiliated party via a series of checks.  It goes without saying that none of this was disclosed to investors, including Plaintiffs.

4.      Though Brooge engaged the supposedly-reputable Ernst & Young to audit its financial statements, Brooge could not have effectuated this scheme without critical support from Ernst & Young and the other EY Defendants.   When it came time to provide potential investors in the SPAC with audited financials, Brooge needed to come up with a way to explain (i) payments from its affiliated entity, with which it had no written contract, and (ii) the corresponding lack of payments from its supposed sole customer.  All of the EY Defendants aided Brooge in devising a plan in which the affiliated entity would be inserted as an intermediary between Brooge and its supposed (but fake) customers, with both Brooge and its counsel, K&L Gates, falsely stating to Plaintiffs that this structure was necessary to protect Brooge's confidential customer information.  Ernst & Young then blessed the scheme by issuing unqualified audit opinions which falsely stated, *inter alia*, that "[Brooge's] financial statements present fairly, in all material respects, the financial position of the Company at 31 December 2018 and 2017."

5.      Brooge was thus able to report tens of millions of dollars in fake revenue to potential SPAC investors in advance of the merger and in its filings with the SEC.  Based on these inflated revenue numbers, Brooge was able to persuade the SPAC investors to exchange their securities for Brooge's securities in a December 19, 2019 U.S. SPAC transaction registered with the SEC at a valuation of over $1 billion on NASDAQ (the "U.S. SPAC Merger").

6.      Following a 25-month investigation into Brooge, in December 2023, the U.S. Securities and Exchange Commission ("SEC") announced fraud charges against Brooge.  Its share price tumbled, and Plaintiffs lost virtually the entire value of their investment.

<u>**PARTIES**</u>

7.      Plaintiff Anvil Trust is a trust governed by the laws of Gibraltar that has as its sole trustee Neil Richardson.  Anvil Trust directly purchased shares of the SPAC immediately prior to the U.S. SPAC Merger.

8.      Plaintiff Stephen Cannon was an investor in the SPAC and served as its CFO from December 2017 up to the time of the U.S. SPAC Merger.  As a result of the U.S. SPAC Merger, Cannon became a beneficial owner of NASDAQ-traded Brooge securities.

9.      Plaintiff Bryant Edwards was an investor in the SPAC.   As a result of the U.S. SPAC Merger, Edwards became a beneficial owner of NASDAQ-traded Brooge securities; Edwards also directly purchased NASDAQ-traded Brooge securities following the U.S. SPAC Merger on or about January 31, 2020; February 28, 2020; March 31, 2020; April 30, 2020; July 31, 2020; August 31, 2020; September 30, 2020; and October 31, 2020.

10.      Plaintiff Neil Richardson was an investor in the SPAC and served as its Chairman from December 2017 and up to the time of the U.S. SPAC Merger.  As a result of the U.S. SPAC Merger, Richardson became a beneficial owner of NASDAQ-traded Brooge securities.

11.     Defendant Ernst & Young Middle East ("EY" or "EY Middle East") is a Bahrain-based public accounting firm with branch offices in Abu Dhabi and Dubai, United Arab Emirates ("UAE").  Ernst & Young Middle East is also another name used by Ernst & Young in issuing audit reports.  Ernst & Young Middle East is a member firm (together with its branches located in Abu Dhabi and Dubai) of Ernst & Young Global Limited ("EYG"), a UK private company limited by guarantee.  EYG is the central coordinating entity of the global EY organization.  The U.S. Public Company Accounting Oversight Board ("PCAOB") filings indicate that Ernst & Young Middle East participated in the audit and audit reports of Brooge's financial statements.

12.     Defendant Ernst & Young Middle East (Abu Dhabi Branch) ("EY Abu Dhabi") is the Abu Dhabi branch of Ernst & Young Middle East, which is located in Abu Dhabi, UAE.  In 2018, Defendant EY Abu Dhabi entered an engagement agreement to audit and report on the financial statements of Brooge.  EY Abu Dhabi is a member of EYG.

13.     Defendant Ernst & Young is a Bahrain-based public accounting firm with branch offices in Abu Dhabi and Dubai, UAE.  Ernst & Young is registered with the PCAOB as an accounting firm that prepares or issues audit reports on issuers (as that term is defined in Section 2(7) of the U.S. Sarbanes-Oxley Act of 2002) and has designated an agent in New York for service of process by PCAOB in enforcement actions.  Ernst & Young is a member firm (together with its branch offices) of EYG.  PCAOB filings indicate that Ernst & Young issued the Brooge audit report dated September 27, 2019, with the participation of Ernst & Young Middle East.

14.     Defendant Ernst & Young John Doe 1 is a member firm of EYG that supplied U.S.-trained personnel with experience in conducting PCAOB audits to the other EY Defendants for purposes of preparing the audit reports of Brooge in preparation for the U.S. SPAC Merger.  On information and belief, Ernst & Young John Doe 1 is a member of EYG.

5

15.     Defendant Ernst & Young John Doe 2, on information and belief, is a United States firm that carried out work on the PCAOB audits under the title "EY US FAAS" [Financial Accounting Advisory Services].  On information and belief, Ernst & Young John Doe 2 is a member of EYG.

16.     At all times relevant to the Complaint, Defendant Anthony O'Sullivan was a managing partner in the UAE office of Defendant Ernst & Young.  O'Sullivan was the audit partner responsible for the audit reports of Brooge's financial statements in preparation for the U.S. SPAC Merger.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, and New York state law.  In connection with the acts, conduct, and other wrongs complained of herein, the EY Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States' mails, and the facilities of a U.S. national securities market.

18.     The Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 & 1367.

19.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this judicial District, the EY Defendants disseminated false and misleading statements into the District, the EY Defendants engaged in deceptive acts causing effects in this District, and the EY Defendants are subject to personal jurisdiction in this District.

## SUBSTANTIVE ALLEGATIONS

### I.     Background of SPACs

20.     A SPAC is a U.S.-listed, publicly-traded shell corporation created to raise capital through an initial public offering ("IPO") with the sole purpose of acquiring or merging with a private company.  The SPAC does not have its own commercial operations; instead, it serves as a vehicle to take a private company public without the traditional IPO process.  In order to create a SPAC, a "sponsor"—a group of investors, typically an LLC—must invest the initial capital to recruit an investment bank, prepare and file IPO documentation, and pre-market the investment offering to interested investors.

21.     The sponsor plays a critical role by forming the SPAC, funding its initial setup costs, and managing its operations.  Sponsors usually contribute a nominal amount in exchange for founder shares, often around 20% of the SPAC's equity post-IPO.  Separately, public investors can buy shares directly from the SPAC at the IPO.  After the SPAC raises funds in its IPO, the sponsor identifies and negotiates with a target company for a merger.  If no deal is completed within a specified timeframe, the SPAC liquidates, and investors are refunded their investment.

22.     The SPAC merger can be structured in various ways.  In this case, at the time of the U.S. SPAC Merger, new SEC-registered shares of a newly formed company were issued to the shareholders of both the SPAC and the new private company in exchange for their shares. The surviving entity is this newly created company, which combines ownership of the two prior companies and retains a NASDAQ listing.

### II.     The Formation of Twelve Seas and the U.S. SPAC Merger

23.     In 2017, a group of investors formed the SPAC Twelve Seas Investment Co. ("Twelve Seas") and its sponsor entity, Twelve Seas Sponsor I LLC (the "Sponsor LLC").  At all

relevant times, Plaintiffs Neil Richardson, Bryant Edwards, and Stephen Cannon were members of the Sponsor LLC, and in that capacity, invested risk capital in, and beneficially owned securities of, Twelve Seas. Edwards was one of two Managing Members of the Sponsor LLC at the time of the merger.

24.     Twelve Seas completed its IPO on the NASDAQ in June 2018, raising $180 million. Additionally, Plaintiff Anvil Trust directly purchased shares of Twelve Seas before the U.S. SPAC Merger, and Plaintiff Bryant Edwards directly purchased shares of Brooge after the U.S. SPAC Merger.

25.     Brooge was first introduced to U.S. investors at a November 2018 meeting in New York City. Twelve Seas began discussions with Brooge about a potential U.S. SPAC merger following an aborted attempt by Brooge to have an IPO on the London Stock Exchange.

26.     On or about April 12, 2019, Brooge Holdings Ltd. ("Brooge Holdings") was incorporated in the Cayman Islands for the purpose of effectuating the anticipated U.S. merger. On or about April 15, 2019, Twelve Seas entered into a merger agreement (the "Merger Agreement") with Brooge, Brooge Holdings, and Brooge's seller for the anticipated December 19, 2019 U.S. SPAC Merger, with the resulting company to be listed on NASDAQ. The merger was announced in New York City on April 18, 2019 through GlobeNewswire.

27.     Pursuant to the Merger Agreement, (1) Brooge Merger Sub Limited (a wholly-owned subsidiary of Brooge Holdings) was to merge with Twelve Seas, with Twelve Seas surviving the merger, and each of the former security holders of Twelve Seas receiving securities of Brooge Holdings, and (2) the outstanding ordinary shares of Brooge were to be exchanged by Brooge's shareholders for ordinary shares of Brooge Holdings. The surviving company, Brooge Holdings, was to be traded on the NASDAQ exchange under the ticker symbol "BROG."

28.     Presentations to market the U.S. SPAC Merger to potential investors, on which the EY Defendants signed off, were conducted by Brooge and Twelve Seas in New York City and other U.S. cities throughout October 2019.

29.     On or about December 19, 2019, the U.S. SPAC Merger closed, and Twelve Seas' securities holders received publicly-listed shares of the new combined company, Brooge Holdings. As a result of the U.S. SPAC Merger, Plaintiffs became beneficial owners of Brooge Holdings securities.

### III.    Brooge's Founding

30.     In 2012, Husam Al Ameri, an Iraqi immigrant to the UAE, was banned by the Dubai Financial Services Authority from the Dubai International Finance Centre for executing a round-trip revenue generation fraud for a company named Capital Investment International [CII-UAE] Ltd.   After the ban, Al Ameri moved to Abu Dhabi, where he partnered with the HH Sheikh Mohammad Bin Khalifa ("MBK"), at the time the eldest son of the president of the UAE and ruler of Abu Dhabi, to establish Brooge.  Al Ameri exercised *de facto* control over the Company.

31.     Brooge was incorporated in the Fujairah Free Zone, UAE, in 2013 to provide oil storage, heating, and blending services.  It was also licensed to engage in trading and storing all varieties of oil products and gas, and to explore and extract crude oil and gas in both onshore and offshore fields.

32.     In 2013, Brooge also entered into two 60-year land leases for a parcel of land to build and operate a terminal in the Port of Fujairah.

33.      In the following years, Brooge proceeded to plan and construct the first phase of its terminal project, which consisted of 14 oil storage tanks with an aggregate geometric oil storage capacity of approximately 0.399 million m$^3$ ("Phase I").  Phase I was complete and become fully

operational in 2018.  In December 2017, Brooge entered into an "offtake" agreement with Coral Energy Pte Ltd ("Coral"), a Singapore-registered oil trading firm, supposedly to lease all the Phase I storage capacity from December 2017 until August 2019 for a monthly fixed storage fee.  Under the terms of the offtake agreement, Coral was also to pay Brooge monthly variable ancillary service fees based on its use of the ancillary services offered by Brooge.

34.     The second phase of the terminal project, which consisted of eight oil tanks with an aggregate geometric oil storage capacity of approximately 0.601 m$^3$ ("Phase II"), commenced operations in September 2021.  In June 2018, Brooge executed an offtake agreement—similar to the Coral agreement—for Phase II of the project with Gunvor Singapore Pte Ltd ("Gunvor"), a purported "international commodities trading" firm.  Under this agreement, Gunvor supposedly agreed to lease all eight of the Phase II tanks for a monthly fixed fee, and to pay additional variable fees for ancillary services.

### IV.     The Fraudulent Round-Tripping Scheme

35.     In reality, Brooge's contract with Coral was a sham, and on information and belief its later contract with Gunvor was also a sham: from December 2017 through August 2019, Brooge never received a single payment from either customer.  But that did not stop Brooge's management from deciding to take Brooge public, and Brooge set its sights on a mid-2019 IPO on the London Stock Exchange.

36.     In anticipation of a London IPO, Brooge needed to create the appearance of significant revenue.  To deceive lenders and investors, Brooge engaged in a classic "round-tripping" scheme.  Round-tripping refers to a fraudulent practice in which two entities engage in a series of transactions that create an appearance of legitimate business activity, while in reality, they are merely exchanging the same money or assets back and forth.

37.    To set up the scheme, Brooge created an entity called Al Brooge International Advisory LLC ("BIA"), an LLC organized under the laws of the UAE, to serve as intermediary between Brooge and its customers.  Brooge and BIA were affiliated entities: Hind Mohammed Muktar Ahmed, one of Brooge's shareholders, was the majority shareholder of BIA until at least January 2020.  BIA had no meaningful business operations aside from participating in the accounting fraud and fake invoicing scheme.

38.    After Brooge received payments (predominantly in the form of checks) from BIA, Brooge—for no consideration—used handwritten paper checks to send the funds back to BIA.  In this way, Brooge could falsely book the money it received from BIA as "revenue" from its customers.

### A. The SEC Announces Fraud Charges Against Brooge

39.    On December 22, 2023, the SEC announced fraud charges against Brooge.  The accompanying press release stated that "Brooge created false invoices to support inflating revenues from its oil facilities in Fujairah, UAE by over $70 million over three years."

40.    In an Order Instituting Cease-and-Desist Proceedings (the "SEC Order") filed by the SEC in the administrative proceeding *In re Brooge Energy Limited, Nicolaas Lammert Paardenkooper and Lina Saheb*, Administrative Proceeding File No. 3-21826, the SEC—for the first time—publicly set forth its findings regarding Brooge.

41.    The SEC Order reported that "[b]efore and after [Brooge went public], between thirty (30) and eighty (80) percent of Brooge's revenues were unsupported and materially misstated from 2018 through early 2021 (the 'Relevant Period.')."  The SEC Order explained that "the crux of the fraud was the creation of two sets of invoices.  The first set consisted of actual invoices to customers who stored oil at Brooge's facilities in Fujairah.  A second set of invoices which

reflected significantly higher rates and volumes were ostensibly sent to customers who never used Brooge's facilities. These invoices were 'paid' through a complicated series of unsupported transactions involving an affiliated or related party."

42.     The SEC Order outlined how falsely inflated revenue figures were presented to investors and lenders—including and in particular investors in the Merger Agreement—to induce them to invest.  Specifically, the SEC Order stated that Brooge's false revenue figures "were used during roadshows in the United States to market the SPAC merger to investors."  The SEC Order concluded that "[as] result of the inflated financials, [Brooge] was able to support a higher share price for the business combination."

43.     The SEC Order detailed the impact of the fraud on the U.S. SPAC Merger and the SPAC's investors:

> On April 15, 2019, [Brooge] entered into a Business Combination Agreement with a SPAC that had raised $180 million in an initial public offering. On November 25, 2019, the SPAC filed a proxy statement that included historical financial information for [Brooge]. According to those proxy materials, [Brooge's] revenues were $35.839 million for 2018 and $22.042 million for the six months ended June 30, 2019—figures that were overstated. After receiving [Brooge's] historical and projected financial performance, the SPAC placed a value on the proposed transaction of approximately one billion dollars.

44.     The SEC Order explained that "Brooge represented to investors, bankers and auditors that it had a single customer contractually obligated to rent 100% of its storage capacity and certain other services at specific rates, thereby producing revenue of approximately $44 million per year. In reality, actual customers used a smaller portion of the storage capacity and almost no ancillary services, at rates lower than those specified in the single customer contract. The difference was addressed through an accounting scheme that relied upon a false second set of

invoices. From December 2017 until at least December 2020, Brooge improperly recognized revenues by issuing invoices to two customers, Customer A and Al Brooge International Advisory LLC ('BIA')."  The entity referred to as "Customer A" in the SEC Order is none other than Coral.

45.    According to the SEC Order, Customer A was a "private company [. . .] that purports to be in the business of buying and selling crude oil."  On December 12, 2017, "[Brooge] entered into an agreement pursuant to which Customer A leased [the entirety of] [Brooge's] storage capacity" in a deal that was to be for "five years at a monthly rate of $5.00 per cubic meter for storage and $1.70 for certain ancillary services."  The Order noted that although this agreement "formed the basis of the company's cash flow projections, *Customer A never stored any oil and never paid anything to [Brooge]."* (Emphasis added).

46.    The SEC Order explained that, rather than lease its entire storage capacity to Company A, "[Brooge] provided services to oil and gas companies that used its storage facility *but at significantly lower rates and volumes than those reflected in the contract with Customer A."* (Emphasis added).

47.    The SEC Order further explained that in order to make it appear that Customer A was paying Brooge, a second set of over one hundred fake invoices were created and addressed to Customer A, and then the financial figures were manipulated.

48.    The SEC Order then detailed how Brooge used a sham entity—BIA—to make it appear as if these invoices had been paid.  As the SEC Order explained, "[Brooge] engaged in a series of complicated transactions with BIA, an affiliated or related party, pursuant to which BIA wrote checks to [Brooge] and then [Brooge] wrote checks for corresponding amounts to BIA. These were recorded in the company's general ledger as payments by Customer A."

49. The SEC Order explained that BIA "was a private company located in Abu Dhabi and an affiliated or related party of [Brooge]" and that one of its owners "was a shareholder in [Brooge]." Furthermore, "[r]epresentatives of [Brooge] opened bank accounts on behalf of BIA. BIA had no meaningful business operations aside from participating in the misstatements of revenues associated with [Brooge]."

50. In August 2019, the SEC Order noted, "the agreement with Customer A was novated to BIA under similar terms," and the fraudulent practices continued. "From August 2019 through at least December 2020, these improper accounting practices continued in largely the same manner, but with BIA." But in fact, "*BIA never stored any oil with [Brooge].*" (emphasis added). The SEC Order described how the fraudulent invoices were issued to BIA to create the illusion of revenue:

> These invoices reflected the same total amounts as the invoices sent to oil and gas companies that used the storage facility but at the contractual storage rate of $5.00 per cubic meter with storage quantities adjusted downward to make the math consistent. Certain of these invoices also re-characterized ancillary services as storage fees. *In this manner, between August 2019 and December 2020, [Brooge] created over two hundred unsupported invoices addressed to BIA.*

(emphasis added).

51. Brooge also engaged in a series of fraudulent transactions to make it appear that BIA was engaging in business with Brooge when it was not. The SEC Order stated the following:

> As it had done previously with respect to Customer A, [Brooge] created invoices addressed to BIA to fill the gap in projected revenues. [Brooge] issued these invoices on a monthly basis from August 2019 through at least December 2020. The majority were in amounts ranging from $1.5-to-$2.5 million. BIA did not store any oil with [Brooge]. In order to make it appear as if these invoices were paid, Brooge engaged in a complicated series of transactions

> pursuant to which BIA wrote checks to [Brooge] and then [Brooge]
> wrote checks in similar amounts to BIA.

52.     The day that the SEC issued its press release announcing fraud charges against Brooge, the price of Brooge stock declined by $0.62, or 15.66%, to close at $3.34 on December 22, 2023.  The next trading day, it fell by a further $0.37, or 11.08%, to close at $2.97 on December 26, 2023.

## B.  The EY Defendants Audit Brooge's Financials, Ignoring Numerous Indicia of Fraud

53.     In 2018, Brooge retained EY to retrospectively audit financial statements for 2015, 2016, 2017, and its half-year financial statements for 2018, in preparation for an IPO on the London Stock Exchange.  Defendant Anthony O'Sullivan, the managing partner of EY, signed an engagement letter for the registration document for the London IPO in October 2018 and became the partner in charge of the audit as Brooge prepared its London IPO and, after Brooge abandoned its London IPO plans, for the U.S. SPAC Merger.

54.     In 2018, Brooge also engaged EY, including EY Abu Dhabi and EY's Dubai branch office, to provide (i) "transaction advisory services" in connection with the planned London IPO, (ii) financial modeling, (iii) reporting accountant services in connection with the preparation of a registration document ahead of the planned London IPO, and (iv) reporting accountant services in connection with the preparation of a prospectus ahead of the planned London IPO.

55.     In early 2019, EY completed audits of Brooge's 2015 through mid-2018 financial statements; these audit reports were included in regulatory filings prepared for the previously-planned London IPO.  Defendants EY and EY Abu Dhabi participated in these audits and in the preparation of each of the audit reports; on information and belief, Defendants Ernst & Young and

personnel of Defendant EY John Doe 1 also participated in these audits and in the preparation of the audit reports.

56.     During the audit periods from 2015 through mid-2018, Brooge should have received significant revenue from its customer Coral based on the two parties' December 2017 offtake agreement and the invoices Brooge allegedly prepared for Coral, but it did not—something each of the EY Defendants actually knew or recklessly failed to know.  As a result, the audit reports for those periods materially misstated the financial condition of Brooge.

57.     The anticipated London IPO did not materialize, and Brooge turned its sights on the U.S. market.  Brooge engaged EY, with the assistance and participation of the other EY Defendants, to audit its 2017, 2018, and partial 2019 financials in connection with the anticipated U.S. SPAC Merger.

58.     The results of the audits conducted by the EY Defendants and the audit reports prepared by them for audit periods 2015 through mid-2018 were communicated to Twelve Seas with the consent and knowledge of the EY Defendants.  Twelve Seas, whose beneficial owners included Plaintiffs Cannon, Edwards, and Richardson, relied on these audit reports in expending time, resources, and professional fees to pursue and ultimately complete the U.S. SPAC Merger.

59.     By April 2019, Brooge and Twelve Seas had committed to the U.S. SPAC Merger, and both Brooge and the EY Defendants knew that completion of the U.S. SPAC Merger would require a PCAOB-compliant audit.  On May 12, 2019, the EY Defendants submitted to Brooge a PowerPoint proposal titled "EY Audit Involvement-Brooge and Twelve Seas Transaction" in which the EY Defendants proposed that Defendant "Anthony O'Sullivan will join the team to issue the PCAOB opinion for the transaction and become the partner of the post-close entity."  The PowerPoint presentation also proposed that the EY "local team" be augmented by a "US and UK

team"—that is, a group of personnel from Defendants EY John Doe 1 with experience in PCAOB-compliant auditing (certain of whom were identified by name, with biography, in the PowerPoint) and "EY US FAAS," a Financial Accounting Advisory Services group from Defendant Ernst & Young John Doe 2, which was to have "[s]eparate fee arrangements," and, on information and belief, was based in the United States.

60.     The PowerPoint explained that "[f]ees for the PCAOB audit" would be "based on actual time incurred and in the range of US $ 700-800 thousand, excluding taxes and expenses" and EY US FAAS, which would, as noted above, have "[s]eparate fee arrangements."

61.     A "key action item" demanded by the EY Defendants in the May 19, 2019 PowerPoint presentation was that Brooge and Twelve Seas were "to commit to retaining EY as the auditor post-transaction close."

62.     Each of the EY Defendants knew that the previously-completed audits could not satisfy the PCAOB auditing requirements because the EY Defendants who conducted the audit and prepared the audit reports could not verify the authenticity of invoices to Coral or whether they had been paid.

63.     Rather than acknowledging the shortcomings of the audits and audit reports prepared in connection with the London IPO—which would jeopardize the lucrative revenue streams the U.S. SPAC Merger and post-transaction audit work would bring to the EY Defendants—the EY Defendants joined the scheme to inflate Brooge's reported revenues.  As described below, in order to satisfy PCAOB requirements in connection with the anticipated U.S. SPAC Merger, the EY Defendants assisted Brooge in (1) novating its contracts with Coral and Gunvor to BIA in a manner that would satisfy PCAOB audit scrutiny, (2) installing BIA as Brooge's sole customer in lieu of the fake customers Coral and Gunvor, and (3) booking false,

round-tripped revenues from BIA as actual revenues of Brooge.  EY, EY Abu Dhabi, and Ernst &
Young had participated in the audits of Brooge's financial statements for 2015 through mid-2018
in connection with the abandoned London IPO and knew, or recklessly ignored, that Coral—not
BIA—was supposedly Brooge's sole customer, and that neither the invoices to, nor payments
from, Coral had been verified.

64.     Following the abandoned London IPO and the subsequent merger agreement
between Brooge and Twelve Seas, Defendants EY John Does 1 & 2 deployed a team of United
States-trained accountants with experience in PCAOB audits to assist the other EY Defendants in
preparing PCAOB-compliant financial reporting and auditing.  Those accountants, along with
Defendant O'Sullivan, were aware of the other EY Defendants' audits of Brooge's financial
statements for 2015 through mid-2018 in connection with the abandoned London IPO and knew,
or recklessly ignored, that Coral—not BIA—was supposedly Brooge's sole customer, and that
neither the invoices to, nor payments from, Coral had been verified.  Nonetheless, O'Sullivan and
EY John Does 1 & 2 supported the EY Defendants and Brooge in (1) novating Brooge's contracts
with Coral and Gunvor to BIA, (2) installing BIA as Brooge's sole customer in lieu of the fake
customers Coral and Gunvor, and (3) booking false, round-tripped revenues from BIA as actual
revenues of Brooge.

65.     Ignoring flagrant indicia of fraud of which they were actually aware or recklessly
ignored, the EY Defendants worked with Brooge to implement this structure in order to justify
Brooge's lack of revenues from Coral.  Then, in numerous calls and meetings with Plaintiff
Stephen Cannon, Brooge management proffered false explanations for the necessity of the BIA
novation structure, while the EY Defendants were present and actually knew (or recklessly
ignored) their falsity and did not contradict the false statements; the EY Defendants thus implicitly

endorsed those false statements.  Further, the EY audit opinions issued in connection with the U.S. SPAC Merger, which were authored by each of the individual EY Defendants, contained false and misleading statements about Brooge's revenues and financial health, leading Plaintiffs to believe that Brooge was a reputable and financially sound company, when in fact it was a sham.

66.    As detailed below, each of the EY Defendants ignored overwhelming indicia of fraud in conducting its audit of Brooge's 2015-2018 financials.

> **i.  The EY Defendants Ignored That Brooge Never Received A Single Payment From Coral, Its Sole Customer, Between December 2017 and August 2019**

67.    As the SEC Order noted, Coral—Brooge's sole customer during the audited period —did not make even one payment to Brooge between December 2017 and August 2019.

68.    Nevertheless, Brooge prepared at least 191 invoices for Coral between December 2017 and July 2019 for services such as storage, handling, throughput, and port charges, among others.  According to the invoices, all of these payments were supposed to have been made to Brooge's account with First Abu Dhabi Bank ("FAB", formerly National Bank of Abu Dhabi). Brooge's bank statements, however, show no entries for Coral or the stated values listed on the supposed invoices.

69.    Though the EY Defendants directly involved in the audits apparently asked Brooge employees for information relating to Coral, each of those Defendants ultimately failed to verify the authenticity of the invoices and whether they were actually paid by Coral.  Because of this, and because Coral in fact never paid a single Brooge invoice, the EY Defendants' reports of audit materially misstated Brooge's revenues.  Each of the EY Defendants participated in the audit of Brooge's financial statements and preparation of the false audit reports and, on information and

belief, approved those reports and consented to their use and dissemination in connection with the U.S. SPAC Merger.

### ii. The EY Defendants Ignored That $5.8 Million Due From Coral In June 2018 Was In Fact Paid By BIA

*70.*    As of May 31, 2018, Coral supposedly owed Brooge over $5.8M under Coral's offtake agreement.  On or about June 20, 2018, a Brooge employee emailed management, stressing that the outstanding balance from Coral was "a very serious issue likely to come up during our IPO discussions," adding: "We must receive the outstanding payments before 30th June as per contract in order to have a clean Audit Report for 30th June, as well as the working capital report for IPO."

71.    On or about June 24, 2018, the aforementioned Brooge employee received a response from another finance employee, who said that Brooge had "already received USD 3.4 Million in June 2018 till now and expect another USD 1.67 Million by tomorrow or day after tomorrow."  Coral, however, never made any such payments to Brooge.

72.    Instead, to account for the missing revenues, Brooge deposited several BIA-issued checks into a bank account with the Commercial Bank of Dubai ending in 862: a check for $871,000 issued on June 24, 2018; a check for $1.08M issued on June 26, 2018; and a check for $1.67M issued on June 27, 2018.  Notably, the amount of the June 27, 2018 check from BIA was for the same amount as the amount that the finance employee reported that he expected to receive from Coral: $1.67M.

73.    Also in June 2018, Brooge deposited three additional BIA-issued checks into a FAB bank account ending in 939: a check for approximately $1,521,505.86 issued on June 6, 2018; a check for approximately $1,642,972.36 issued on June 20, 2018, and a check for approximately $1,669,398.48 issued on June 24, 2018.

74.    The four checks that were recorded in Brooge's bank statements as having been deposited between June 20 and June 30 totaled $5.85M—an almost identical amount to the figure that Coral owed Brooge that month.

75.    On September 17, 2018, an EY employee emailed a Brooge finance employee requesting a scanned copy of Brooge's bank statements to confirm that the Company had received the outstanding balance in full from Coral.  If the EY Defendants ever saw the bank statements, those Defendants either (a) did not ask to see copies of the checks to confirm the identity of the payor, or (b) accepted some explanation from Brooge as to why BIA paid on behalf of Coral.

76.    Further, each of the payments from BIA in June 2018 was subsequently transferred within a few days—in almost identical amounts—to the entity Al Brooge Capital Providing for Oil Gas LLC, a then-20% shareholder of Brooge.

### iii. The EY Defendants Ignored That Millions of Dollars Circulated Between BIA and Brooge In the Absence of Any Contractual Relationship

77.    Though BIA and Brooge had no contractual relationship between April 2018 and August 2019—and there was not one invoice issued to BIA prior to August 2019—EY and the other EY Defendants who participated in the audits and preparation of the audit reports apparently did not take issue with the fact that 85 checks were issued between BIA and Brooge during this timeframe, representing $31.3M paid by BIA to Brooge, and $23M paid by Brooge to BIA.

78.    Though most payments from BIA to Brooge were in the form of checks, BIA also made three wire transfers to Brooge's bank accounts between April and September 2018, totaling approximately $1.7M.  These BIA payments were all listed on Brooge's bank statements as "Inter Group Transfer."  EY, apparently, did not question the purpose of these payments, or the role of

BIA, as it conducted its audit; neither did any of the other EY Defendants who participated in the audits and preparation of the audit reports.

### C. The EY Defendants' Key Role in the Round-Tripping Scheme

79.     The EY Defendants did not only ignore the round-tripping scheme in conducting their audits: they played a key role.

80.     Following the execution of the Merger Agreement in April 2019, Stephen Cannon, on behalf of Twelve Seas, began engaging directly with EY regarding the status of the audited financials.   In May 2019, EY told Brooge that O'Sullivan—as well as additional U.S. and U.K. personnel from EY John Does 1 & 2 who were knowledgeable about U.S. financial reporting, PCAOB compliance, and U.S. mergers, acquisitions, and IPOs—would join Brooge's audit team to issue the PCAOB-compliant audit opinion required for the U.S. SPAC Merger.  As they had done previously in connection with the audits conducted for the London IPO, Defendants EY Abu Dhabi and Ernst & Young participated in the audit and the preparation of the audit opinion.

81.     O'Sullivan, an EY partner who had overseen the audit of Brooge's financials in connection with the London IPO, was EY's chief point of contact with Cannon.

82.     Though EY initially represented to Cannon that Brooge's financial statements were "all ready" by May 2019, Cannon still had not received audited financials from EY.

83.     On or about May 23, 2019, Cannon participated in a call with representatives of the EY Defendants, including but not limited to Anthony O'Sullivan, Ashraf Eradhun, and specialists from EY John Doe 1, as well as Brooge management.  On that call, the EY Defendants present represented to Cannon that they had "completed" the 2018 audit, and that delays sending Brooge's financial statements were due to "confidential treatment requests" to the SEC to protect the identities of Sheik MBK, Coral, and Gunvor from public disclosure. In addition, Brooge

management stated that it was discussing with the EY Defendants the idea of novating Brooge's Coral and Gunvor contracts to insert BIA as an intermediary in order to protect the identities of Coral and Gunvor from public disclosure. The EY Defendants on the call did not contradict the statement made by Brooge management.

84.     As the EY Defendants knew, their audits could not verify receipt of a single payment from Coral—supposedly Brooge's only (but fake) Phase I customer. The EY Defendants thus knew or recklessly ignored that Brooge's statement about the need to insert BIA as an intermediary to "protect" the identities of Coral and Gundvor was false. To the contrary, the EY Defendants and Brooge were developing this scheme to justify the lack of documented payments from Coral, Brooge's sole customer.

85.     On or about April 29, 2019,  and over several calls and emails in the ensuing weeks, Brooge explained to Cannon that concealing the identities of Coral and Gunvor was necessary to protect Brooge's pricing data from its competitors. When Cannon inquired with Brooge's deal attorneys, K&L Gates, about whether concealing the identities of Coral and Gunvor in public SEC filings was in fact necessary to protect Brooge's pricing information, they confirmed that it was, and explained that the disclosure of the identities of Brooge's customers in public SEC filings in anticipation of the U.S. SPAC Merger could reveal pricing information to its competitors.

86.     By June 2019, the EY Defendants still had not sent the audited financial statements to Twelve Seas. On or about June 3, 2019, Cannon had another call with the EY Defendants, including Defendant O'Sullivan and the U.S. PCAOB audit specialists from EY John Doe 1. On that call, EY—speaking through Defendant O'Sullivan—falsely attributed the further delay to an "auditor independence" analysis. In fact, the delay was attributable to problems posed by a bank

default and the lack of verifiable revenues from Coral to Brooge.  None of the other EY Defendants on the call corrected or otherwise objected to EY/O'Sullivan's false statement.

87.     The EY Defendant team—speaking through Defendant O'Sullivan—explained to Cannon that prior to EY's engagement as Brooge's independent registered accounting firm, certain of the EY Defendants had assisted with certain listing materials in connection with the anticipated UK IPO, which is prohibited by PCAOB rules on auditor independence.  As a result, EY and O'Sullivan explained, EY needed to expressly request permission from the SEC to proceed as auditor in connection with the U.S. SPAC Merger.

88.     On or about June 14, 2019, Brooge's deal counsel, K&L Gates, told Cannon that because the SEC was unlikely to agree to confidential treatment of Coral and Gunvor, the novation structure was necessary to conceal their identities in public SEC filings in anticipation of the U.S. SPAC Merger.

89.     On or about June 14, 2019, EY, with the participation and acquiescence of the other EY Defendants involved in Brooge's audits, "signed off" on an investor presentation that was disseminated for use in connection with the U.S. SPAC Merger "road shows" in New York City and elsewhere.

90.     The June 14, 2019 investor presentation was materially false and misleading at the time it was made because, as each EY Defendant actually knew or recklessly ignored, (1) Brooge's revenues were materially lower than reflected in the investor presentation, (2) Brooge did not at that time actually have a "Phase I End User via a 4 year remaining take-or-pay contract for 100% of Phase I capacity" as stated in the presentation, and (3) Brooge did not at that time have a "4.8-year weighted average renewable take-or-pay contract life for 100% of available and in-construction storage capacity (Phases I & II)" as stated in the investor presentation.

91.     In reliance on the "sign off" provided by EY—and without reason to suspect its falsity—Twelve Seas filed the investor presentation with the SEC on June 14, 2019.

92.     Over the following weeks, representatives of the EY Defendants, including but not limited to O'Sullivan and the PCAOB audit specialists from EY John Doe 1, exchanged several communications with Cannon and others about the auditor independence request to the SEC, with Twelve Seas growing increasingly concerned about the delay.  In fact, the delay was largely due to the continuing efforts of the EY Defendants and Brooge to implement a structure installing BIA as an intermediary between Brooge and its supposed (but fake) customers, Coral and Gunvor, all for the fraudulent purpose of concealing that Brooge had no verifiable revenues from Coral or Gunvor.

93.     On or about July 31, 2019, O'Sullivan emailed to Cannon, as well as other representatives of Brooge and Twelve Seas, a final draft letter to the SEC requesting that the SEC approve EY's auditor independence.  In that letter, O'Sullivan falsely represented Brooge's 2018 revenues to be in excess of $35 million.

94.     This statement was materially false and misleading at the time it was made because, as the EY Defendants knew or recklessly ignored, Brooge's revenue for 2018 was materially lower than $35.8 million.

95.     EY submitted the final auditor letter to the SEC later that day; Anthony O'Sullivan signed it.

96.     On or about August 1, 2019, Brooge and BIA executed an agreement "replacing" Coral with BIA as Brooge's sole (direct) customer.  Also around that time, Brooge, BIA, and Coral entered into a fraudulent "deed of novation," novating Brooge's contracts with Coral and Gunvor

to BIA for the entire historical audit period.  The EY Defendants assisted Brooge in implementing this structure.

97.    This novation structure was fraudulent because it allowed the EY Defendants to explain away the "revenues" from BIA (which were not, in fact, actual revenues) and conceal the fact that Brooge had never received a single payment from Coral—thus allowing Brooge to materially overstate its revenues to the SPAC investors, including Plaintiffs.

98.    EY, EY Abu Dhabi and Ernst & Young each assisted Brooge in (1) novating its contracts with Coral and Gunvor to BIA, (2) retroactively installing BIA as Brooge's sole customer in lieu of the fake customers Coral and Gunvor, and (3) booking false, round-tripped revenues from BIA as actual revenues of Brooge.  Plaintiffs relied on the fraudulent novation agreement, as well the explanations of Brooge and its counsel of its necessity, in their decision to approve the U.S. SPAC Merger.

### D.  The EY Defendants Continue to Make Numerous Material False Statements About Brooge's Revenues Leading Up to the U.S. SPAC Merger

99.    In the ensuing months, EY, with the direct participation of each of the other EY Defendants, issued numerous unqualified or "clean" audit reports that incorrectly certified Brooge's financial statements as being free of material misstatements.  Each of these audit reports stated that Brooge's statement of financial position and the results of operations for the relevant years presented "fairly" the financial position of Brooge. The audit reports also stated that EY "conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board."  All of these statements were materially false because Brooge's financial statements for the 2017-2019 did not present fairly, in all material respects the Company's results of operations or its financial condition.

      **i.**    **The EY Defendants Were Bound to Comply With Applicable Auditing Standards**

100.      Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in, or to do business with, a public company. As such, the Supreme Court has described the role of an independent auditor as that of a "public watchdog," established to improve the reliability of financial statements, enhance the credibility of those statements and thereby, support the capital markets. *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

101.    To oversee independent auditors, the U.S. Sarbanes-Oxley Act ("SOX") established the PCAOB. The PCAOB is given the responsibility to establish professional audit standards applicable to audits of certain publicly-traded companies, including Brooge (the "PCAOB Standards"). Since 2004, the PCAOB has required that foreign issuer auditors register with the PCAOB.

102.    PCAOB Standards effective for the fiscal years ending December 15, 2017 to December 14, 2020 were grouped into the following five topical categories and referenced with an "AS" prefix:

    a.   General Auditing Standards: Standards on broad auditing principles, concepts, activities and communications;

    b.   Audit Procedures: Standards for planning and performing audit procedures and for obtaining audit evidence;

    c.   Auditor Reporting: Standards for auditors' reports;

    d.   Auditor Reporting: Standards for auditors' reports;

        Matters Relating to Filings Under Federal Securities Laws: Standards on

certain auditor responsibilities relating to SEC filings for securities offerings
and reviews of interim financial information; and

e.  Other Matters Associated with Audits: Standards for other work performed in
conjunction with an audit of an issuer.

103.  PCAOB Standards state that the objective of a financial statement audit is the
expression of an opinion on the fairness with which the audited financial statements present, in all
material respects, the financial position, results of operations, and the cash flows of the reporting
entity, in conformity with generally accepted accounting principles.[2]

104.  To achieve this objective, EY—along with the other EY Defendants who
participated in the audit and preparation of the audit reports—was responsible for planning and
performing its financial statement audits to obtain "reasonable assurance" about whether Brooge's
consolidated financial statements were free of material misstatements, including misstatements
caused by fraud.  In reaching its conclusions, EY was required to apply the appropriate professional
skepticism, and "should not be satisfied with less than persuasive evidence because of a belief that
management is honest."

105.  To identify the risks of material misstatements, the PCAOB Standards, including
but not limited to those specifically identified below, require auditors to perform the procedures
identified in those standards:

---

[2] AS 1001.01. The standards (AS) cited herein governed audits of financial statements for fiscal
years ending December 15, 2017, through December 14, 2020.

| PCAOB Standard | Requirement |
|---|---|
| AS 2110.07 - 2110.17 | Require an auditor to obtain a sufficient understanding of the company and its environment, including steps to "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement." |
| AS 2110.18 - 2110.40 | Require an auditor to obtain an understanding of internal controls over financial reporting to (a) identify the types of potential misstatements, (b) assess the factors that affect the risks of material misstatement, and (c) design further audit procedures. |
| AS 2110.46 - 2110.71 | Require an auditor to perform audit procedures designed to identify areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation. |
| AS 2301.08 and AS 2301.13 | Require the auditor to design and perform the audit procedures in a manner that is specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk. |
| AS 2410.03 and AS 2410.14 - 2410.18 | Require the auditor to perform procedures to obtain an understanding of the company's relationships and transactions with its related parties that might reasonably be expected to affect the risk of material misstatement of the financial statements, including whether related-party transactions have been properly accounted for and disclosed. |
| AS 1015.01 and AS 1015.07 - 1015.09 and AS 2401.13 | Require an auditor to apply "due professional care," including the appropriate "professional skepticism." Professional skepticism requires the auditor to maintain a questioning mind and critically assess the audit evidence it obtains. |
| AS 1105.04 and AS 1105.29, AS 2810.08 | Prohibit an auditor from issuing any unqualified opinion when it fails to gather sufficient appropriate audit evidence necessary to support its opinion. When audit evidence obtained from one source is inconsistent with that from another, or if the auditor has doubts regarding the reliability of audit evidence, auditors are required to perform additional procedures necessary to resolve the matter. |
| AS 2401.66 - 2401.67A, AS 2410.05 and AS 2410.11 - 2410.12 | Require, as applicable, that auditors understand the business rationale for significant unusual transactions including corresponding related-party transactions and evaluate whether the rationale—or lack of rationale—suggest that the transaction may have been entered into to engage in fraudulent financial reporting or conceal the misappropriation of assets. Require additional evaluation and measures for identified related party transactions required to be disclosed or determined to be a significant risk. |

106.    In sum, these PCAOB Standards required the EY Defendants to identify and respond to risks that Brooge's financial statements could be materially misstated.    The EY Defendants failed to adhere to these standards in auditing Brooge's financial statements and issuing their audit opinions.

      ii.    **In Violation of PCAOB Accounting Standards, EY, with the Participation of the Other EY Defendants, Issues An "Unqualified" Audit Opinion**

107.    On September 27, 2019, EY—with the active participation and consent of the other EY Defendants—issued an "unqualified" audit opinion of the financial statements Brooge for 2017 and 2018 (the "2019 Audit Opinion").    The 2019 Audit Opinion provided:

> To the Shareholders and the Board of Directors of Brooge Petroleum and Gas Investment Company FZE
>
> **Opinion on the Financial Statements**
>
> We have audited the accompanying statements of financial position of Brooge Petroleum and Gas Investment Company FZE (the Company) as of 31 December 2018 and 2017, the related statements of comprehensive income, changes in equity and cash flows for each of the two years in the period ended 31 December 2018, and the related notes (collectively referred to as the "financial statements"). ***In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company at 31 December 2018 and 2017,*** and the results of its operations and its cash flows for each of the two years in the period ended 31 December 2018, in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board.
>
> **The Company's Ability to Continue as a Going Concern**
>
> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in note 2.2 to the financial statements, the Company has a working capital deficiency and has not complied with certain covenants included in its bank loan agreements. These conditions raise substantial doubt about the Company's ability to continue as a

going concern. Management's evaluation of the events and conditions and management's plans regarding these matters also are described in note 2.2. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

**Restatement of 2017 Financial Statements**

As discussed in note 2.4 to the financial statements, the 2017 financial statements have been restated to correct a number of misstatements.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as

evaluating the overall presentation of the financial statements. We
believe that our audits provide a reasonable basis for our opinion.

/s/Ernst & Young
We have served as the Company's auditor since 2018.
Abu Dhabi, United Arab Emirates
27 September 2019

108.    Immediately after signing it, EY sent the 2019 Audit Opinion to Brooge with the

intention that it be disseminated to Twelve Seas.

109.    The following statements from the 2019 Audit Opinion were materially false and

misleading statements of actual fact:

  i.  EY's statement—made with the active participation and consent of the remaining

      EY Defendants—that it "conducted [its] audits in accordance with the standards of

      the PCAOB" was materially false and misleading because, as EY knew or was

      reckless in not knowing, EY did not conduct its audit of Brooge's financials in

      accordance with applicable PCAOB Standards.

 ii.  EY's statement—made with the active participation and consent of the remaining

      EY Defendants—that it "believe[d] that [its] audits provide[d] a reasonable basis

      for [its] opinion" was materially false and misleading because, as EY knew or was

      reckless in not knowing, EY's audit did not provide a reasonable basis to issue its

      clean audit opinion on Brooge's financials.

iii.  EY's statement—made with the active participation and consent of the remaining

      EY Defendants—that "[i]n [its] opinion, the financial statements present[ed] fairly,

      in all material respects, the financial position of the Company at 31 December 2018

      and 2017, and the results of its operations and its cash flows for each of the two

      years in the period ended 31 December 2018, in conformity with International

Financial Reporting Standards (IFRS)," was materially false and misleading because, as EY knew or was reckless in not knowing, Brooge's consolidated financial statements did not fairly represent the financial picture of Brooge.

110.     That same day, September 27, 2019, EY signed a consent to reference its firm under the caption "Experts" and to the use of the 2019 Audit Opinion with respect to Brooge's financial statements in the SEC registration statement (Form F-4) and related proxy statement/prospectus for the registration of shares and warrants in connection with the U.S. SPAC Merger.

111.     Also on September 27, 2019, Brooge Holdings filed with the SEC its Form F-4, which published the audited financial statements, the 2019 Audit Opinion, and EY's consent to the use of its 2019 Audit Opinion.

112.     The financial statements filed with the Form F-4 listed Brooge's 2018 revenue as $35,839,298.

113.     That statement was materially false and misleading at the time it was made because as EY actually knew—or at best, intentionally disregarded—that Brooge's revenue for 2018 was only a fraction of the reported $35.8 million.

114.     On October 7, 2019, Ernst & Young filed a Form AP with PCAOB identifying O'Sullivan as the engagement partner and EY Middle East as a participating audit firm with respect to the 2019 Audit Opinion.

115.     On October 8 and then again on October 25, EY, with the participation and acquiescence of the other EY Defendants involved in Brooge's audits, signed off on two additional investor presentations to be filed with the SEC by Brooge Holdings.  Both contained essentially the same material misrepresentations that the June 14, 2014 investor presentation contained: that (1) Brooge's revenues were materially higher than reflected in the investor presentation, (2)

Brooge had a "Phase I End User via a 3.5 year remaining take-or-pay contract for 100% of Phase I capacity," and (3) Brooge had a 4.5 and "take-or-pay contract life for 100% of available and in-construction storage capacity (Phases I & II)."

116.    On December 19, 2019, in reliance on (i) the fraudulent novation structure and (ii) EY's repeated false statements, made with the participation and consent of the other EY Defendants, about its compliance with PCAOB standards and Brooge's financial condition, Twelve Seas voted to approve the merger, and the U.S. SPAC Merger was completed on or about December 19, 2019.

**E.  Following the U.S. SPAC Merger, the EY Defendants Continue to Misrepresent Brooge's Financial Condition**

117.    On April 9, 2020, EY convened a Brooge audit committee meeting to discuss finalizing its audit of Brooge's 2019 financials. O'Sullivan and a senior manager, Syed Asad Swaleh, were in attendance. EY reported that it had *"identified a fraud risk related to the completeness of the owners' account."* EY criticized payments to "shareholders"— which were in fact predominantly payments to BIA as part of the fraudulent round-tripping scheme. EY further stated that Brooge's 'Going Concern' qualification was at risk, because the company was using funds *"to repay shareholder dues"* rather than meeting its contractual obligations with FAB and avoiding repeated defaults on its loans from the bank.

118.    During a subsequent Brooge audit committee meeting on July 7, 2020, EY continued to express concern about Brooge's bank defaults. O'Sullivan added that it was EY's opinion that Brooge's CFO and finance staff lacked the necessary expertise and capabilities to fulfil their financial reporting responsibilities.

119.    At the end of the meeting, O'Sullivan noted that EY was *"in internal discussions to assess continuation as statutory auditors of the Company, given the various issues faced during*

*the audit for 2019."* Yet despite the issues raised during the audit committee meetings, EY—with, on information and belief, the involvement of the remaining EY Defendants—signed off on the 2019 financial statements, and Brooge's FY2019 Form 20-F included a June 30, 2020 audit opinion  (the "2020 Audit Opinion") from EY which was made with the active participation and consent of the other EY Defendants.

120.    EY essentially repeated its 2019 Audit Opinion, with  no material, relevant differences, opining that "the consolidated financial statements presented fairly, in all material respects, the financial position of Brooge and its subsidiaries as of December 31, 2019."

121.    The following statements from the 2020 Audit Opinion are false and misleading statements of actual fact:

i.   EY's statement—made with the active participation and consent of the other EY Defendants—that it "conducted [its] audits in accordance with the standards of the PCAOB" was materially false and misleading because, as E&Y knew or was reckless in not knowing, EY did not conduct its audit of Brooge's financials in accordance with applicable PCAOB Standards.

ii.  EY's statement—made with the active participation and consent of the other EY Defendants—that it "believe[d] that [its] audits provide[d] a reasonable basis for [its] opinion" was materially false and misleading because, as EY knew or was reckless in not knowing, EY's audit did not provide a reasonable basis to issue its clean audit opinion on Brooge's financials.

iii. EY's statement—made with the active participation and consent of the other EY Defendants—that "[i]n [its] opinion, the financial statements present[ed] fairly, in all material respects, the financial position of the Company at 31 December 2019

and 2018, and the results of its operations and its cash flows for each of the two

years in the period ended 31 December 2017, in conformity with International

Financial Reporting Standards (IFRS)," was materially false and misleading

because, as EY knew or was reckless in not knowing, Brooge's consolidated

financial statements did not fairly represent the financial picture of Brooge.

122.    The 2020 Audit Opinion also appeared in the amended FY2019 SEC Form 20-F

filed on November 27, 2020, the FY2020 SEC Form 20-F filed on April 5, 2021, the amended

FY2020 SEC Form 20-F filed on April 6, 2021, the SEC Form F-1 Registration Statement filed

on August 17, 2020, the SEC Prospectus Supplement (424B3) filed on August 26, 2020, and the

February 4, 2021 Post-Effective Amendment No. 1 to the SEC Form F-1 Registration Statement.

123.    EY subsequently resigned as Brooge's auditor in October 2020, having cited

*"material weaknesses in the Company's internal control over financial reporting"* relating to the

preparation of Brooge' consolidated financial statements for 2017, 2018 and 2019.

124.    PwC took over as Brooge's auditor for FY2020, and provided a clean audit opinion

for that year in Brooge's FY2020 SEC Form 20-F, which was filed on April 5, 2021.

125.    Despite the fact that EY had resigned as auditor, Brooge asked EY in early April

2021 to reaffirm its consolidated financial statements for the financial years 2018 and 2019.

126.    EY agreed to reaffirm Brooge's financials and provided the company with a signed

consent letter for dissemination.

127.    Defendant O'Sullivan was again the EY representative responsible for reaffirming

Brooge's restated historical financial statements, although the April 2021 consent letter was signed

under the name EY and not by him specifically.   On information and belief, each of the EY

Defendants was involved in the reaffirmation of the 2018 and 2019 financial statements.

### V.    Revelations of the Company's Invoicing Fraud Cause the Company's Stock Price to Plummet

100.    PwC was to remain Brooge's auditor for FY2021. By August 2022, however, the SEC Form 20-F for FY2021 had yet to be filed, and on August 17, 2022,  Brooge filed an SEC Form 6-K announcing that its "previously issued audited consolidated financial statements as of and for the periods ending December 31, 2020, 2019, and 2018, and the previously issued unaudited financial statements for interim periods therein and the six months ended June 30, 2021 . . . should no longer be relied upon."

101.    On December 8, 2022, Brooge's CEO abruptly resigned.  The news was announced via an SEC Form 6-K filed after hours on that day and caused the stock to drop from a closing price of $5.74 per share on December 8, 2022, to $5.32 per share the following day, a drop of 7.32%.

102.    Then, on January 5, 2023, Brooge filed an SEC Form 6-K announcing that PwC had resigned as its auditor.  On January 20, 2023, Brooge filed another SEC Form 6-K with a letter from PwC attached which explained the reasons for PwC's resignation, citing serious concerns regarding the company's senior management. In the letter, PwC stated that certain "***illegal acts***" had come to the attention of PwC, which "***will have a material effect on the financial statements of the Company*** . . . ." (emphasis added).

103.    On April 26, 2023, Brooge filed an SEC Form 20-F for FY2022 with a new auditor, Affiniax AAS, which included revenue restatements for FY2018, FY2019, and FY2020.  The SEC Form 20-F shows that between 2018 and 2020, Brooge's revenue was overstated as follows:

| Year Ended | Revenue as Reported | Revenue as Restated | %Change |
|---|---|---|---|
| 2018 | $35,839,268 | $6,387,348 | -82.18% |
| 2019 | $44,085,374 | $15,885,219 | -63.97% |
| 2020 | $41,831,537 | $27,191,176 | -35.00% |

100.     On December 22, 2023, Brooge filed an after-hours SEC Form 6-K announcing its

settlement with the SEC; the SEC Order was issued the same day.  Brooge stated in its SEC Form

6-K announcing the news:

> December 22, 2023 – As an update to our prior disclosures, without admitting or
> denying any violation or wrongdoing, Brooge Energy Limited (the "Company")
> has reached a settlement with the U.S. Securities and Exchange Commission
> ("SEC") related to alleged fraudulent accounting and offering conduct by the
> Company and two former officers. Pursuant to the SEC administrative order,
> which was entered today, and which centers on financial statements that have since
> been restated by the Company, the Company will pay a civil money penalty in the
> amount of $5,000,000. The Company also agreed to cease and desist from
> committing or causing any violations and any future violations of certain
> provisions under the Securities Act of 1933 and the Securities Exchange Act of
> 1934. Two former officers of the Company resolved related SEC charges without
> admitting or denying the SEC's findings.

101.     Brooge's stock closed at $3.34 per share on December 22, 2023, dropping 17.66%

over the next two trading days, closing at $2.75 per share on December 27, 2023.  This drop was

both a corrective disclosure and a materialization of the risks of the fake invoicing scheme.

102.     Between November 25, 2019, and December 27, 2023, Brooge's stock price

declined from $10.28 per share to $2.75 per share, a drop of 74.58%.

103.     As a result of the EY Defendants' wrongful conduct, and the resulting precipitous

decline in the market value of the Company's securities, Plaintiffs have suffered significant losses

and damages.

## **COUNTS**

### **Count I:**
### **(Violation of Section 10(b) of the Exchange Act and Rule10b-5(a) and Rule 10b-5(c))**

104.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

105.    The EY Defendants engaged in fraudulent acts and participated in a scheme to defraud Plaintiffs by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for Brooge securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c).

106.    The EY Defendants' fraudulent acts in furtherance of the scheme were intended to and did: (a) deceive Plaintiffs, as alleged herein; (b) artificially inflate and maintain the market for and market prices of Brooge's securities; and (c) cause Plaintiffs to purchase or otherwise acquire Brooge securities at artificially inflated prices.

107.    EY and the other EY Defendants acted as independent auditor for Brooge, and knew and intended for Plaintiffs to rely on their fraudulent acts. The EY Defendants had access to Brooge employees and continuing access to and knowledge of Brooge's confidential corporate, financial, operating and business information. Despite this access and knowledge, in order to assure the completion of the U.S. SPAC Merger and fraudulently boost Brooge's reported assets and earnings, the EY Defendants employed a deceptive device to defraud Plaintiffs by fraudulently assisting Brooge to implement a fraudulent novation scheme in order to justify BIA's payments to Brooge and conceal Brooge's lack of revenues from its customers.  The EY Defendants also remained silent as Brooge and its counsel represented that the purpose of this structure was to protect Brooge's confidential information, when the EY Defendants actually knew or recklessly ignored that the real purpose of the structure was to conceal Brooge's lack of revenue from Coral and Gunvor and thus to materially misstate the company's financial condition.

108.    Plaintiffs relied on the EY Defendants' participation in the fraudulent "novation" structure, as well as their acquiescence in Brooge's false statements that the purpose of the structure was to protect Brooge's trade secrets.

109. As a result of the EY Defendants' fraudulent acts in furtherance of this scheme, the price of Brooge securities was artificially inflated when the U.S. SPAC Merger closed.

110. As a direct and proximate result of the wrongful conduct of the EY Defendants, Plaintiffs suffered damages in connection with their respective purchase or acquisition of Brooge's securities.

**Count II:**
**(Violation of Section 10(b) of the Exchange Act and Rule10b-5(b))**

111. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112. EY and each of the EY Defendants made false statements of material fact by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for Brooge securities in violation of Section 10(b) for the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b).

113. EY and each of the EY Defendants made false and misleading statements of material fact, which were intended to and did: (a) deceive Plaintiffs, as alleged herein; (b) artificially inflate and maintain the market for and market prices of Brooge's securities; and (c) cause Plaintiffs to purchase or otherwise acquire Brooge securities at artificially inflated prices.

114. EY, working in concert with each of the other EY Defendants, acted as independent auditor for Brooge, and with the active participation and consent of the other EY Defendants knew and intended for Plaintiffs to rely on their statements about Brooge's financial condition and audit opinions. EY and the other EY Defendants had access to Brooge employees and continuing access to and knowledge of Brooge's confidential corporate, financial, operating and business information. Despite this access and knowledge, in order to assure the completion of the U.S. SPAC Merger and fraudulently boost Brooge's reported assets and earnings, EY and the other EY

Defendants knowingly concealed Brooge's accounting manipulations and other schemes undertaken, and falsely represented to Plaintiffs (a) that Brooge's revenues exceeded $35M in 2018; (b) that Brooge had take-or-pay contracts for 100% of Phase I and Phase II capacity; (c) that Brooge's financial reports were free from material misstatements, and that (d) EY's audits of Brooge's financials were in accordance with applicable PCAOB standards.

115.    As a result of the false statements identified above, the price of Brooge securities was artificially inflated when the U.S. SPAC Merger closed.

116.    Plaintiffs relied on the statements and reports containing false and misleading information which were prepared and disseminated by the EY Defendants to purchase or otherwise acquire Brooge's securities at artificially inflated prices.

117.    As a direct and proximate result of the wrongful conduct of EY and the other EY Defendants, Plaintiffs suffered damages in connection with their respective purchase or acquisition of Brooge's securities.

**Count III**
**(Common Law Fraud)**

118.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    EY and each of the EY Defendants made false and misleading statements of material fact, which were intended to and did: (a) deceive Plaintiffs, as alleged herein; (b) artificially inflate and maintain the market for and market prices of Brooge's securities; and (c) cause Plaintiffs to purchase or otherwise acquire Brooge securities at artificially inflated prices.

120.    EY, working in concert with the other EY Defendants, acted as independent auditor for Brooge. The EY Defendants knew and intended for Plaintiffs to rely on their false and fraudulent statements about Brooge's financial condition and audit opinion. EY and the other EY

Defendants had access to Brooge employees and continuing access to and knowledge of Brooge's confidential corporate, financial, operating and business information. Despite this access and knowledge, in order to assure the completion of the U.S. SPAC Merger and fraudulently boost Brooge's reported assets and earnings, EY and the remaining EY Defendants knowingly concealed Brooge's accounting manipulations and other schemes undertaken, and falsely represented to Plaintiffs (a) that Brooge's revenues exceeded $35M in 2018; (b) that Brooge had take-or-pay contracts for 100% of Phase I and Phase II capacity; (c) that Brooge's financial reports were free from material misstatements, and that (d) EY's audits of Brooge's financials were in accordance with applicable PCAOB standards.

121.    As a result of the false statements identified above, the price of Brooge securities was artificially inflated when the U.S. SPAC Merger closed.

122.    Plaintiffs relied on the statements and reports containing false and misleading information which were prepared and disseminated by the EY Defendants to purchase or otherwise acquire Brooge's securities at artificially inflated prices.

123.    As a direct and proximate result of the wrongful conduct of the EY Defendants, Plaintiffs suffered damages in connection with their respective purchase or acquisition of Brooge's securities.


## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court enter judgment against the EY Defendants, and award Plaintiff the following relief:

A.    Compensatory damages in favor of Plaintiffs for all damages sustained as a result of the EY Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.  Exemplary and punitive damages, in an amount to be proved at trial;

C.  Prejudgment and post-judgment interest, as well as Plaintiffs' reasonable attorneys' fees, expert fees, and costs; and

D.  Such other and further relief as this Court may deem proper.

Dated: December 17, 2024                    **AEGIS LAW GROUP LLP**

                                            By: /s/ Serine Consolino
                                            801 Pennsylvania Ave NW, Suite 740
                                            Washington, D.C. 20004
                                            Serine Consolino (SC0525)
                                            Alison Van Horn (AVH-0050)
                                            Tel: 202-706-7031
                                            sconsolino@aegislawgroup.com
                                            avanhorn@aegislawgroup.com

                                            *Counsel for Plaintiffs*