## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ANVIL TRUST et al.,                          )
                                             )
                          *Plaintiffs*,      )
  v.                                         )          **Civil Action No. 24-9731-PKC**
                                             )
ERNST & YOUNG et al.,                        )
                                             )
                          *Defendants.*      )
_____)

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

LEGAL ARGUMENT .........................................................................................................3

I.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED ................................................3

     A.  Plaintiffs' Claims Are Not Barred By the State of Repose .................................3

     B.  Plaintiffs' Claims Are Not Barred by the Statute of Limitations .......................6

II.  THE AMENDED COMPLAINT ADEQUATELY PLEADS FALSITY ...............................8

     A.  Defendants Themselves Falsely Attributed Delays to "Confidential Treatment Requests" and "Auditor Independence Analyses"...................................................8

     B.  Defendants Themselves Falsely Implied That the Novation Structure Was Necessary to Protect the Identities of Coral and Grundvor from Public Disclosure ................................9

     C.  Defendants' Own Letter—Which Defendants Sent Directly to Plaintiffs—Falsely Stated That Brooge's 2018 Revenue Exceeded $35M ................................................10

     D.  Defendants' Audit Opinions Contain Numerous False Statements and Are Actionable Under Controlling Second Circuit Precedent .....................................................11

     E.  Defendants' Approval of the Investor Presentations Subjects Them to "Scheme" Liability Under *Lorenzo* .................................................................................13

III. THE AMENDED COMPLAINT ADEQUATELY PLEADS SCIENTER...........................14

     A.  The Amended Complaint Sufficiently Pleads Defendants' Conscious Misbehavior........14

     B.  The Amended Complaint Sufficiently Pleads Defendants' Recklessness........................15

IV.  THE AMENDED COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION .............16

V.   DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENTS FAIL ...............................20

     A.  Because the United States Has an Interest in Enforcing U.S. Securities Laws, Plaintiffs' Choice of Forum Should Presumptively Stand ................................................20

     B.  The UAE Is Not an Adequate Alternative Forum .............................................21

     C.  The Balance of Public and Private Interests Favors the U.S. ............................22

          1.  Defendants Have Not Shown That the Private Interest Factors "Strongly" Favor Dismissal ..............................................................................22

          2.  Defendants Have Not Shown That the Public Factors "Strongly" Favor Dismissal...24

VI.  DEFENDANTS' PERSONAL JURISDICTION ARGUMENTS ARE MOOT ...................25

CONCLUSION ...............................................................................................................25

## PRELIMINARY STATEMENT

Defendants were not "victims" of the Brooge fraud: they were its enablers. The Amended Complaint details how Defendants—a collection of Middle East- and U.S.-based Ernst & Young affiliates who were hired to audit Brooge's financials in connection with a December 2019 U.S. Special Purpose Acquisition Company merger transaction (the "SPAC merger")—played a pivotal role in a years' long scheme to help Brooge Petroleum and Gas Investment Company FZE ("Brooge" or the "Company") defraud investors. The fundamental financial picture presented by Brooge and Defendants to Plaintiffs was a fraud: though Brooge disclosed revenues in the tens of millions of dollars in its audited financials, in fact, Brooge fabricated between 30% and 80% of its 2018, 2019, and 2020 revenues. To conceal Brooge's lack of revenues from investors, the public, and the SEC, Brooge engaged in a "round-tripping" scheme, using an affiliate (Al Brooge International Advisory LLC, "BIA") to create the illusion of revenue. BIA would write checks to Brooge, and then Brooge would promptly send the money back in order to book fake "collections" without legitimate business activity.

Even the most cursory audit would have revealed a litany of red flags, including that: (a) Brooge never received a single payment from Coral, its sole customer, between December 2017 and August 2019; (b) $5.8 million due from Coral was in fact paid by BIA in June 2018, and then almost immediately transferred to another affiliated entity; and (c) millions of dollars circulated between BIA and Brooge in the absence of any contractual relationship. But Plaintiffs need not allege what a prudent auditor *should have known* had they conducted a proper audit: as the Amended Complaint details, Defendants had *actual knowledge* that from January through June 2018, Brooge received no revenue at all from Coral—even though the "invoices" that Defendants reviewed reflected an outstanding balance in excess of $5.8 million. *See* Am. Comp. ¶ 75 ("On

1

July 11, 2018, Brooge sent EY's Muhammad Farooq a statement of account from the time period January 1, 2018 through July 10, 2018, which reflected the complete absence of revenues from Coral during that period.").

Instead of sounding the alarm, Defendants doubled down. When the missing revenues threatened the SPAC merger timeline, Defendants helped install BIA as a supposed "intermediary" between Brooge and its customers to paper over the missing Coral revenues. Defendants then peddled the false story to Plaintiffs that the "delay" was due to "confidential treatment requests" to the SEC to shield Coral's identity from the public and then, as the delay continued, "auditor independence requests" to the SEC. But the lack of verifiable revenues from Coral—coupled with the circular money flow between BIA and Brooge, of which Defendants knew or should have known—made the cover story facially implausible.

Despite these red flags, on September 27, 2019, Defendants issued an unqualified audit opinion falsely stating that Brooge's 2017-2018 financials "presented fairly" in all material respects the financials of the company, and that Defendants had conducted the audits in accordance with PCAOB standards. The same day, Defendants consented to the use of that opinion in the SEC Form F-4 for the SPAC transaction. The Form F-4 falsely listed Brooge's 2018 revenues as $35.84 million—numbers Defendants knew could not be squared with the bank records they had been shown.

Defendants cannot reconcile these inconvenient facts with their contrived narrative that they are somehow "victims" of Brooge's fraud. They are not. Plaintiffs' 10b-5 claims easily clear Rule 12(b)(6) under these damning facts.

## LEGAL ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

#### A.  Plaintiffs' Claims Are Not Barred By the State of Repose

Defendants' assertion that Plaintiffs' Section 10b-5 claims are barred by the five-year statute of repose (28 U.S.C. § 1658(b)(2)) fails for three reasons.  ***First,*** several cases in the Second Circuit, relying on *Arnold v. KPMG LLP*, have held that the five-year statute of repose runs from the date "the parties have committed themselves to complete the purchase or sale transaction and not the date of the misrepresentation."  334 F. App'x 349, 351 (2d Cir. 2009).[1]  These include cases where—such as here—the misrepresentations *predate* the transaction or sale of securities.[2]

Though other cases in the Second Circuit have held that the statute of repose runs from the date of the last misrepresentation, to construe Section 1658(b)(2) as running from the date of purchase or sale of securities is more congruent with the actual text of the statute, which provides that claims under Section 10b-5 may be brought no later than "5 years after such *violation.*"  28 U.S.C. § 1658(b)(2) (emphasis added).  Because no "violation" has occurred until a plaintiff has actually purchased securities, the five-year statute of repose necessarily begins on the date of that purchase or sale (*i.e.*, when the parties commit to the transaction), not on the date of any antecedent misrepresentation.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55 (1975)

---

[1] *See also Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-CV-3406,  2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015), *aff'd*, 672 F. App'x 85 (2d Cir. 2016) ("[I]t is clear that under *Arnold*, it is the relevant securities transaction, rather than the wrongful conduct of the defendant, that triggers Section 1658(b)'s statute of repose."); *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) ("[A] violation of Section 10(b) and Rule 10b-5 occurs at each transaction for the purpose of calculating the repose date.").

[2] *See, e.g.*, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736, 2020 WL 5751232, at *15 (S.D.N.Y. Sept. 25, 2020) (claims based on purchase of securities within five-year statute of repose timely, even where misrepresentations that induced the purchase of securities occurred outside the five-year window); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010) (same); *see also Du v. Segelman*, No. 23-CV-6780, 2025 WL 1707176, at *15 (E.D.N.Y. Mar. 28, 2025) ("In short, the Court first finds that the relevant conduct with respect to the statute of repose, as alleged in the Amended Complaint, includes all conduct up to and including Plaintiff signing the original offering documents on July 30, 2015.").

(mere offerees of securities have no standing to sue for securities fraud based on a misleading prospectus because they have not purchased shares); *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 176 (2d Cir. 2011) ("A securities fraud claim does not accrue until after the plaintiff actually purchases (or sells) the relevant security.").  In sum, because the SPAC merger closed on December 19, 2019, this lawsuit—which was filed on December 17, 2024—was filed within the five-year statute of repose and is timely.

*Second*, Plaintiffs have pled scheme liability claims under Section 10b-5(a) and (c), for which the statute of repose runs from the last act in furtherance of the scheme.  Defendants concede that (a) Plaintiffs' allegations about Defendants' involvement in the novation structure suffice to allege scheme liability and (b) the statute of repose for scheme liability does not run until the scheme is completed.  *See* MTD at 8.[3]  Defendants nonetheless argue that Plaintiffs' claims have expired because "Plaintiffs allege no deceptive acts by Defendants after October 2019."  *See id.*

That is wrong.  To state a claim under Rule 10b-5(a) and (c), a plaintiff must allege that the defendant "(1) committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter."  *Sec. & Exch. Comm'n v. Passos*, 760 F. Supp. 3d 95, 123 (S.D.N.Y. 2024).  While misstatements or omissions cannot form the "*sole* basis" for scheme liability, misstatements and omissions can certainly "form *part* of a scheme liability claim."  *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original); *see also Passos*, 760 F. Supp. 3d at 123 ("A plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions." (citations

---

[3] *See also, e.g.*, *Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350, 2022 WL 17539124, at *13 (E.D.N.Y. Dec. 8, 2022) ("Here, because the SEC made allegations of an integrated fraudulent scheme that included all of the EB-5 investments, whether made before or after September 27, 2016, the Court would have found, in the alternative, that § 2462's five-year statute of limitations did not begin to run after the scheme was completed—when the final sale of the EB-5 investments occurred, in December 2017—thereby making the SEC's entire civil penalty claim timely.").

omitted)).  Here, the "scheme" was defrauding investors into purchasing securities at a grossly inflated price; the scheme was thus "completed" no earlier than the close of the SPAC merger on December 19, 2019.

**Third**, at least one Plaintiff, Bryant Edwards, purchased Brooge securities *after* Defendants' 2020 misrepresentations, making the Amended Complaint's Section 10b-5 claims timely at least with respect to him.  The Amended Complaint alleges Defendants issued a June 30, 2020 Audit Opinion containing numerous materially false statements (*see* Am. Compl. ¶¶ 128-130) and that Edwards "directly purchased NASDAQ-traded Brooge securities on [] July 31, 2020; August 31, 2020; September 30, 2020; and October 31, 2020" (*see* Am. Compl. ¶ 9). Defendants baldly assert that Bryant does not plead reliance, but Defendants forget that the U.S. Supreme long ago recognized that for 10b-5 plaintiffs, *reliance is presumed* where "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."  *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 225 (1988)).  That test is easily met here: the misrepresentations in the 2020 Audit Opinion were both material[4] and publicly known (because the Audit Opinion was publicly filed); the stock traded in an efficient market (*see Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (noting that "most courts agree" that a NASDAQ listing "is a good indicator of efficiency")); and Edwards purchased the stock between the time when the misrepresentations were made (i.e., June 2020) and the truth was revealed (i.e., December 2023).  Thus, even assuming *arguendo* the five-year statute of repose ran from the date of Defendants' last misrepresentation, because Edwards

---

[4] Defendants have not challenged the materiality of the alleged misrepresentations in their opening brief, and so cannot do so on reply.

purchased Brooge securities in reliance on Defendants' June 2020 false and misleading Audit Opinion, his Section 10b-5 claims are timely by any measure.

### B.  Plaintiffs' Claims Are Not Barred by the Statute of Limitations

Defendants' next contention—that Plaintiffs' Section 10b-5 claims are "time-barred under the applicable two-year statute of limitations" because they were on "notice" of the fraud as early as August 2022—runs headlong into controlling Second Circuit precedent.  Whether Plaintiffs should have been on notice of claims "is a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012).  Accordingly, a motion to dismiss will only be granted where "*uncontroverted evidence* irrefutably demonstrates [that the] plaintiff discovered or should have discovered" enough facts to adequately plead a claim.  *Id.* (emphasis added).  "Defendants bear the burden of proving that the limitations period has run." *Langhamer v. Johnson*, No. 1:22-CV-05404, 2023 WL 6691017, at *13 (S.D.N.Y. Oct. 12, 2023).

Defendants fail to meet this heavy burden at the motion-to-dismiss stage.  Defendants erroneously contend that the applicable statute of limitations began running "no later than August 17, 2022," when Brooge stated in an SEC filing that its 2018, 2019, and 2020 financial statements "should no longer be relied upon."  But for Section 10b-5 claims, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact *to adequately plead it in a complaint*." *City of Pontiac*, 637 F.3d at 175 (emphasis added).  "In other words, the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.*  Following *City of Pontiac,* courts in the Second Circuit

have denied motions to dismiss on statute of limitations grounds where, as here, the purported disclosure failed to put plaintiffs on notice of all elements of a securities fraud claim.[5]

Defendants fail to explain why Brooge's unadorned sentence that its financial statements "should not be relied upon" would provide Plaintiffs with "sufficient detail and particularity" about Defendants' conduct to adequately plead a claim under 10b-5 as required by *City of Pontiac*. *See Langhamer*, 2023 WL 6691017, at *13 (complaint was timely where defendants "fail[ed] to argue why Plaintiffs' failure to receive timely audited statements would by itself enable Plaintiffs to allege all elements of a [securities] fraud claim"). Indeed, the August 2022 disclosure provides *zero* information about what specific statements were false, how they were false, or, most notably, Defendants' scienter—all necessary elements of a claim under Section 10b-5. Because "there is no indication on the face of the [complaint]" conclusively showing when Plaintiffs learned enough information to adequately plead 10b-5 claims," disposing of this case on statute-of-limitations grounds is improper at this stage. *In re Direxion Shares ETF Trust*, No. 09-CV-8011, 2012 WL 717967, at *5 (S.D.N.Y. Mar. 6, 2012) (noting court's "inability to resolve fact-intensive issues relating to the statute of limitations on a motion to dismiss" and denying defendants' motion to dismiss on statute of limitations grounds).

---

[5] *See, e.g.*, *Pearlstein v. Blackberry Ltd*, No. 13-CV-7060, 2022 WL 1000314, at *7 (S.D.N.Y. Apr. 4, 2022) (corrective disclosures did not supply facts "supporting an allegation of scienter on [defendant's part]" necessary to trigger statute of limitations); *Moon Joo Yu v. Premiere Power LLC*, No. 14-CV-7588, 2018 WL 456244, at *8 (S.D.N.Y. Jan. 17, 2018) (statute of limitations not triggered because "facts comprising [defendant's] claims were not contained in any public disclosures by Defendants"); *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.*, No. 13-CV-6705, 2014 WL 241739, at *14 (S.D.N.Y. Jan. 22, 2014) (SEC filings and other public materials describing "substantial concerns" with mortgage originators were "insufficient to trigger the statute of limitations"); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 284 (S.D.N.Y. 2006) (calling "absurd" defendants' argument that plaintiffs could have drafted the complaint based on article that lacked any "indication of fraud or misrepresentations").

## II.    THE AMENDED COMPLAINT ADEQUATELY PLEADS FALSITY

Defendants' contention that Plaintiffs "do not plausibly allege falsity" ignores the numerous materially false statements identified in the Amended Complaint, which makes clear that Defendants *themselves* made numerous actionable misstatements and omissions to Plaintiffs during the course of their work on the SPAC Merger.  Defendants' false statements included, *inter alia*: (i) that the delays sending Brooge's financial statements were due to "confidential treatment requests" to the SEC to protect the identities of Sheikh MBK, Coral, and Gunvor from public disclosure (Am. Compl. ¶ 86); (ii) that further delays in producing audited financials were due to an "auditor independence analysis" (Am. Compl. ¶¶ 90-92, 95-100); (iii) that the novation structure was necessary to protect the identities of Coral and Grundvor from public disclosure (Am. Compl. ¶¶ 86-87); and (iv) in a draft letter sent directly to Plaintiffs, Defendants falsely stated that Brooge's 2018 revenue exceeded $35 million (Am. Compl. ¶ 101).  Defendants also "signed off" on three separate investor presentations touting take-or-pay contracts and 100% capacity despite knowing revenues and contracts did not support those claims (Am. Compl. ¶ 93).

### A.  Defendants Themselves Falsely Attributed Delays to "Confidential Treatment Requests" and "Auditor Independence Analyses"

Initially, Defendants represented to Plaintiff Stephen Cannon that the audited financial statements would be ready by April 2019 to allow sufficient time for review before the December 2019 SPAC merger deadline.  Am. Compl. ¶ 85.  However, as the delay stretched on for weeks and then months, Defendants began proffering knowingly false reasons for the delay, first attributing the delay to "confidential treatment requests" to the SEC, and then eventually to an "auditor independence analysis."  *See* Am. Compl. ¶¶ 85, 86, 90-92, 95-100, 156.

Defendants insist that their statements were technically true because they were making "a simple statement of a procedural fact."  *See* MTD at 15.  But "literal accuracy is not enough" to

absolute those who intentionally mislead investors through half-truths and omissions. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015); *see also Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.").

Here, Defendants created the false impression that the delays were attributable to the need for "confidential treatment requests" and then an auditor independence analysis—which they knew to be false—and omitted the key information that the delays were *actually* attributable to the lack of verifiable revenues from Brooge. Moreover, Defendants' insistence that they themselves were fooled by Brooge's "pretextual ruse" is irrelevant at this stage because it is nothing more than an improper assertion of fact. *See* MTD at 15. "Drawing all reasonable inferences in Plaintiffs' favor, as the Court must on a motion to dismiss, the omission of information" by Defendants could have "plausibly have misled a reasonable investor regarding the financial risks facing the Company." *Roofers Local No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 349 (S.D.N.Y. 2024).

### B. Defendants Themselves Falsely Implied That the Novation Structure Was Necessary to Protect the Identities of Coral and Grundvor from Public Disclosure

Likewise, Defendants' attempt to escape liability for the numerous false statements about the purpose of the novation fails for two independent reasons. ***First,*** Defendants' repeated omissions about the purpose of the novation structure subjects them to liability. *See* Am. Compl. ¶¶ 65, 80, 81, 92. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) (Rule 10b-5's prohibition on misleading omissions "requires disclosure of information necessary to ensure that statements already made are clear and complete."). ***Second,*** Defendant Anthony O'Sullivan, the lead Ernst & Young partner on the engagement, expressly blessed the

purpose of the novation structure when he stated that "*E&Y would assist Brooge to ensure that the novation structure is done correctly and accomplishes the desired outcome, without delay.*"  Am. Compl. ¶ 87.  That statement was false and misleading, because it was made in the context of a series of conversations in which others falsely told Plaintiffs that the novation structure was necessary to conceal the identities of Coral and Grundvor.  *Operating Local 649*, 595 F.3d at 92 ("Some literally accurate statements can, through their context and manner of presentation, [become] devices which mislead investors." (citations omitted)).

### C.  Defendants' Own Letter—Which Defendants Sent Directly to Plaintiffs—Falsely Stated That Brooge's 2018 Revenue Exceeded $35M

Defendants' rejoinder to the allegation that they *directly* disseminated false revenue figures to Plaintiffs via a draft letter to the Securities and Exchange Commission is to pronounce that accountants are free to make materially false statements to investors as long as those statements are accompanied by a disclaimer that they are "unaudited."  For this proposition, Defendants cite *Wright v. Ernst & Young LLP*, No. 97-CV-2189, 1997 WL 563782, at *2 (S.D.N.Y. Sept. 10, 1997) *aff'd* 152 F.3d 169 (2d Cir. 1998).  But defendants misstate the holding in *Wright*.  In *Wright*, the plaintiffs sought to hold Ernst & Young liable for the audited *company's* press release containing unaudited financial figures.  The Court held that because the statements were unaudited, it would be unwarranted for the public to "infer an auditor's approval from a company's release of financial data."  *Id.*  The Second Circuit affirmed, but for a different reason.  "Regardless of how we treat the disclaimer," the Second Circuit explained, subjecting Ernst & Young to liability for the statements contained in the company's press release would improperly impose "aiding and abetting liability" on Ernst & Young.  *Id.*  In short, nothing in *Wright* gives auditors carte blanche to make intentionally false statements to investors simply because they use the label "unaudited".

To the contrary, courts have held auditors liable for unaudited financial statements where the auditor itself was the maker of the false statement.[6]

### D. Defendants' Audit Opinions Contain Numerous False Statements and Are Actionable Under Controlling Second Circuit Precedent

Furthermore, contrary to Defendants' assertion otherwise, the numerous false statements included in Defendants' 2019 and 2020 Audit Opinions are also actionable, whether or not they constitute statements of "opinion." The 2019 and 2020 Audit Opinions contain, *inter alia*, the following false statements: (i) that EY "conducted [its] audits in accordance with the standards of the PCAOB"; (ii) that it "believe[d] that [its] audits provide[d] a reasonable basis for [its] opinion"; and (iii) that "the financial statements present[ed] fairly, in all material respects, the financial position of the Company." *See* Am. Compl. ¶¶ 118, 130.

In *Omnicare*, the U.S. Supreme Court held that statements of opinion are actionable misrepresentations or omissions in at least three situations: (1) when "the speaker did not hold the belief she professed"; (2) when "the statement of opinion contains embedded statements of fact that are untrue"; and (3) when "the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 533 (S.D.N.Y. 2024) (citing *Omnicare*, 575 U.S. at 186). All three scenarios are at play here. ***First,*** the Amended Complaint alleges that because Defendants were aware of Brooge's lack of revenues, ignored numerous red flags, and play a key role in the round-tripping scheme, Defendants did not

---

[6] *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 343 (S.D.N.Y. 2004) (auditor Arthur Andersen liable for "unaudited statements regarding swaps that plaintiffs can prove Andersen made and that were attributed to Andersen"); *see also In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 164 (D. Mass. 2002) (holding that where "KPMG Belgium orally conveyed false and misleading statements, substantively similar to those contained in its 1999 audit report, directly to shareholder representatives" those unaudited statements were "equally actionable under Rule 10b-5").

subjectively believe that their audits complied with PCAOB standards, did not believe that the audits provided a reasonable basis for their opinion, and did not believe Brooge's financial statements presented fairly in all material respects the financial conditions of the Company. *See* Am. Compl. ¶¶ 67-106. Citing *In re Puda,* 30 F. Supp. 3d 230, 258 (S.D.N.Y. 2014)—which Defendants mischaracterize as a case "dismissing claims against auditors because plaintiff failed to plead subjective falsity"—Defendants baselessly assert that the Amended Complaint is somehow "devoid" of any particularized facts pleading subjective falsity. *See* MTD at 17. In fact, the Court in *In re Puda* disposed of Plaintiffs' claims *on summary judgment* because Plaintiffs "*put forth no admissible evidence*" that their conduct did not meet PCAOB standards. 30 F. Supp. 3d at 258. This case is not yet at the summary judgment stage. In any event, the Amended Complaint is replete with allegations that Defendants did not subjectively believe—and indeed, could not have subjectively believed, given the glaring red flags they chose to ignore—any of the foregoing statements set forth in the Audit Opinions. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 156 (S.D.N.Y. 2021) ("In order to sustain its [10b-5] claim, lead plaintiff need not allege the [] Auditors' contemporaneous belief in the content of the [] audit opinions. Lead plaintiff only needs to allege that the [] Auditors ignored a sufficient number of red flags, which would permit the inference that the [] Auditors did not believe that they conducted a compliant audit.").

**Second**, Defendants' 2019 and 2020 Audit Opinions contain at least two demonstrably false "embedded statements of fact": that the audits complied with PCAOB standards, and that Brooge's financial statements presented fairly the financial condition of the Company. Defendants mischaracterize these statements as merely "subjective opinion statements"; they are not. Each of these assertions contains a "determinate, verifiable statement." *Stadium Capital LLC v. Co-*

*Diagnostics, Inc.,* No. 22-CV-6978, 2024 WL 456745, at *3 (S.D.N.Y. Feb. 5, 2024) (citing *Omnicare,* 575 U.S. at 184). It is objectively verifiable whether (a) the audits complied with PCAOB standards (they did not; *see* Am. Compl. ¶¶ 114, 115) and (b) the financial statements presented fairly "in all material respects" the financial condition of the company (they did not).

**Third,** and finally, Defendants erroneously contend that the Audit Opinions identify "no material omission that renders these opinions misleading"—and specifically highlight Defendants' statement that they had "substantial doubt" about Brooge's ability to continue as a going concern. *See* MTD at 18. But *it is precisely this partial disclosure* that obligated Defendants to make a full disclosure about the breadth of Brooge's financial irregularities. "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Stadium Capital*, 2024 WL 456745 at *2 (holding that it was misleading to describe the company's "difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly").

### E.  Defendants' Approval of the Investor Presentations Subjects Them to "Scheme" Liability Under *Lorenzo*

Finally, Defendants deny liability for their "sign-off" of three investor presentations containing numerous materially false and misleading statements about Brooge's revenues and financial condition as foreclosed by the U.S. Supreme Court in *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135 (2011). But *Janus* is inapplicable to scheme liability claims following *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019). Under *Lorenzo*, "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5,' and that even a disseminator who did not 'make' the misstatements as defined by *Janus* can thus be held liable as a primary violator." *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 320 (S.D.N.Y. 2019) (quoting *Lorenzo,* 587 U.S. at 78). Thus, Defendants' signoff on the three investor presentations also subjects them to scheme liability.

### III.    THE AMENDED COMPLAINT ADEQUATELY PLEADS SCIENTER

A plaintiff can plead scienter "by pleading facts that give rise to strong circumstantial evidence of conscious misbehavior or recklessness." *Huey v. Anavex Life Sci. Corp.*, No. 24-CV-01910, 2025 WL 1707581, at *6 (S.D.N.Y. June 18, 2025) (citing *In re Avon Sec. Lit.,* No. 19-CV-01420 (S.D.N.Y. Nov. 18, 2019)).  The Second Circuit does *not* require "'great specificity' provided the plaintiff alleges enough facts to support a 'strong inference of fraudulent intent.'" *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 219 (S.D.N.Y. 2004) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000)).  The Amended Complaint easily meets that standard.

### A.  The Amended Complaint Sufficiently Pleads Defendants' Conscious Misbehavior

"Express allegations of deliberate misconduct *easily* satisfy the standard for pleading scienter." *In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 472 (S.D.N.Y. 2004) (emphasis added) (allegations of scienter specifically pled where Defendants "actively facilitated" securities fraud by issuing unqualified opinion despite their knowledge of ongoing fraud).  Thus, the Amended Complaint's allegations alone that Defendants not only blessed but helped to implement the novation structure that enabled the round-tripping scheme are more than sufficient to plead Defendants' conscious misbehavior.  *See* Am. Compl. ¶ 87.

Likewise, allegations that Defendants "had access to information suggesting that their public statements were not accurate" are also "enough in and of themselves to satisfy scienter at the pleading stage." *Huey*, 2025 WL 1707581, at *6.  Here, the Amended Complaint pleads that Defendants learned information that was contrary to the numerous false public statements about Brooge's revenue numbers and financial health: Defendants received a bank statement showing a *complete absence of revenue* from Coral for from January through July 2018 (Am. Compl. ¶ 75)

and were also aware that the purpose of the novation structure was to conceal Brooge's lack of revenues (Am. Compl. ¶¶ 82-105). *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 282, 308 (S.D.N.Y. 2019) (scienter adequately pled where "Defendants allegedly learned information that contradicted countless statements [the company] had previously made about endpoints.").

### B.  The Amended Complaint Sufficiently Pleads Defendants' Recklessness

Even if the Amended Complaint did not sufficiently plead conscious misbehavior—and it does—the Amended Complaint amply pleads Defendants' recklessness.  Recklessness "can be established by allegations that the auditor was aware of 'red flags' of fraud and yet recklessly disregarded them." *In re Aegean*, 529 F. Supp. 3d at 149 (citations omitted).  Because "it is elementary that, on a motion to dismiss, the Complaint must be read as a whole, the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *Id.*  (citing *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007)).

To refute the Amended Complaint's allegations of red flags, Defendants do exactly what courts instruct defendants *not* to do: they "single[] out certain paragraphs in the Complaint that summarize the more precise allegations" and complain that these allegations are "insufficiently particularized." *In re Philip Serv. Corp.*, 383 F. Supp. 2d at 475-76.  But the Amended Complaint details a pattern of non-payment and related-party cash movements that should have triggered heightened scrutiny under PCAOB standards.  For example, Brooge's sole "customer," Coral, did not make a single payment from December 2017 through August 2019, even as Brooge generated at least 191 invoices supposedly payable to its FAB account—facts Defendants knew or should have known from bank statements and the company's own materials.  *See* Am. Compl.  ¶ 68. Further, in June 2018, just as Coral's overdue balance exceeded $5.8 million, Brooge deposited a series of checks from BIA totaling ~$5.85 million—the same amount management expected from

Coral—and then transferred those sums out within days to a company shareholder; Defendants received account statements showing the absence of Coral receipts and nonetheless failed to verify payor identity or follow the money. *See* Am. Compl. ¶¶ 68; 70-74. Equally stark, between April 2018 and August 2019—before any contract with BIA—eighty-five checks and additional wires moved tens of millions between BIA and Brooge, some labeled "Inter Group Transfer," yet Defendants apparently did not probe the purpose or business rationale of these transfers. *See* Am. Compl. ¶ 79.

Under PCAOB standards, these were textbook red flags demanding further investigation. *See In re Aegean Marine*, 529 F. Supp. 3d at 155-56 (rejecting argument that allegations in isolation lacked specificity, and holding that "a significant number of related-party transactions, unpaid accounts, escalating receivables, and a founder and former CEO who still maintained significant control over the company," among other things, "should have prompted further investigation" by auditors). Thus, Defendants' assertion that their innocence is an "equally plausible narrative" is unconvincing because it ignores several inconvenient facts that Defendants have not explained and cannot explain. *See In re Philip Serv. Corp,.* 383 F. Supp. 2d at 473-74 (rejecting Defendants' argument that the allegations "can be read in an innocent way" because it "rel[ied] on convoluted inferences" favoring the auditor); *In re Aegean Marine*, 529 F. Supp. 3d at 155-56 ("Court is entirely unpersuaded by the Greek Auditors' position: essentially, that the reasonable inference is that the Greek Auditors were fooled by the forgeries and fake accounting documentation allegedly created").

## IV.    THE AMENDED COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

"Loss causation . . . is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 22-CV-3925, 2025

WL 965265, at *10 (S.D.N.Y. March 31, 2025) (quoting *ATSI Commc'ns, Inc. v. Shaar Func, Ltd.*, 493 F.3d 87, 106 (2d. Cir. 2007)).  "To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir. 2001)).  Plaintiffs sufficiently allege loss causation where "they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure."  *In re Axsome Therapeutics*, 2025 WL 965265, at *10 (citing *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020)).[7]  This pleading burden is not heavy, as "the complaint must simply give Defendants 'some indication' of the actual loss suffered and of a *plausible* causal link between that loss and the alleged misrepresentations."  *Constr. Laborers Pension Trust for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 549-50 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)) (emphasis added).

The Amended Complaint's allegations suggest not only a "plausible" but an overwhelming causal link between Defendants' misrepresentations and their loss.  Plaintiffs allege that on December 22, 2023, Brooge "filed an after-hours SEC Form 6-K announcing its settlement with the SEC; the SEC Order was issued the same day."  Am. Compl. ¶¶ 100.  The Form 6-K announced that Brooge "had reached a settlement with the [SEC] related to alleged fraudulent accounting and

---

[7] *See also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273-74 (S.D.N.Y. 2010) (loss causation adequately pled where plaintiff "identifie[d] several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and also allege[d] that the value of plaintiffs Ambac stock declined immediately following the corrective disclosures"); *In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287-88 (S.D.N.Y. 2008) (press release announcing that the SEC had commenced an investigation, coupled with a 7.5% stock price drop the next day, created a sufficient causal connection to plead loss causation); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252-53 (S.D.N.Y. 2007) (4.5% drop in market price of shares in response to announcement of SEC investigation into options backdating was sufficient to plead loss causation); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-CV-2700, 2012 WL 3957916, at *16-17 (S.D.N.Y. Sep. 10, 2012) (allegations that company's stock price fell 18% immediately following a corrective disclosure sufficient to plead loss causation).

offering conduct by the Company and two former officers," and that further, that Brooge "will pay a civil money penalty in the amount of $5,000,000" and "has agreed to cease and desist from committing or causing any violations and any future violations of certain provisions under the Securities Act of 1933 and the Securities Exchange Act of 1934." *Id.* Immediately following the December 22 Form 6-K, Brooge's stock price plummeted, "dropping 17.66% over the next two trading days." *Id.* ¶ 101. Thus, the SEC Order and accompanying December 22, 2023 Form 6-K disclosing—for the first time—the SEC investigation and settlement, Brooge's fraudulent revenues, and the mechanics of the round-tripping scheme plainly qualify as corrective disclosures sufficient to plead loss causation. *See Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19-Civ-3354, 2020 WL 3268531, at *19 (S.D.N.Y. June 17, 2020) (new information in corrective disclosure coupled with "timing and magnitude of [the] precipitous decline" in stock price "more than sufficient" to plead loss causation); *Constr. Laborers Pension Trust*, 433 F. Supp. 3d at 550 (where "CBS's stock declined immediately after each of the alleged corrective disclosures," loss causation sufficiently alleged "at least for purposes of deciding a motion to dismiss"); *see also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) (clarifying that there is no requirement that corrective disclosures emanate from any particular source, "so long as the truth is disclosed in some fashion").

Defendants challenge the sufficiency of Plaintiffs' allegations by attempting to characterize the August 17, 2022 Form 6-K as the "true" corrective disclosure, which states merely that Brooge's financial statements "should no longer be relied upon." MTD at 22. That argument fails for at least two reasons. **One,** as already discussed, the August 17 SEC filing contains no information whatsoever about Brooge's financial condition, let alone the SEC investigation or the fraudulent round-tripping scheme. The essence of a corrective disclosure is the affirmative

publication of the truth.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) ("[A]lthough no specific corrective disclosure ever exposed the precise extent of [defendant's] alleged fraud, Plaintiffs' theory of loss causation nevertheless rested on the revelation of the truth.").  Here, the round-tripping scheme and fraudulent financial statements communicated to investors the false message that Brooge was a legitimate company in good financial health.  The August 2022 Form 6-K did not correct that false message and so does not qualify as a corrective disclosure.  And even if it did, the December 2023 Form 6-K revealed material, new information previously unknown to the public, thus making the December 2023 Form 6-K a "corrective disclosure."  *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 211 (S.D.N.Y. 2019) ("To constitute a corrective disclosure, a statement must 'reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint'" (quoting *Cent. States Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. Appx. 72, 75 (2d Cir. 2013)).

    ***Two***, regardless of the merits of their argument, Defendants' attempt to assert a "truth-on-the-market" defense is categorically improper at the pleading stage.  "Courts routinely reject similar arguments at the motion to dismiss stage because the truth-on-the-market defense 'is intensively fact-specific and is rarely an appropriate basis for dismissing a [Section] 10(b) complaint.'"  *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 197-98 (D. Conn. 2023) (quoting *Roofer's Pension Fund v. Papa*, Civ. Act. No. 16-2805, 2018 WL 3601229, at *9 (D.N.J. July 27 2018)); *see also Freeland v. Iridium World Comm'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (rejecting the defendants' attempt "to inject [a] truth on the market defense" into loss causation and holding that "[the truth-on-the-market defense] remains a factual determination to be decided by the jury"). For these reasons, Plaintiffs' allegations that the December 2023 SEC Order and accompanying

Form 6-K, which caused a precipitous drop in the Company's stock price over the next two business days, qualify as a "corrective disclosure" under Second Circuit precedent.

## V.    DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENTS FAIL

Defendants' arguments for dismissal based on the doctrine of *forum non conveniens* miss the mark.  "Any review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'"  *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). Defendants moving for dismissal on the ground of *forum non conveniens* "bear a 'heavy burden' and must persuade the court that consideration of the relevant factors counsels in favor of resolving the case in an alternative forum."  *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 285 (E.D.N.Y. 2021) (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)).  Important here: the Second Circuit has recognized that "a strong public interest favors access to American courts for those who use American securities markets."  *Id.*  (quoting *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 33 (2d Cir. 2002)).

### A.    Because the United States Has an Interest in Enforcing U.S. Securities Laws, Plaintiffs' Choice of Forum Should Presumptively Stand

A *forum non conveniens* inquiry should begin with the assumption that a plaintiff's choice of forum "will stand unless the defendant can demonstrate that reasons exist to afford it less deference."  *Mucha*, 540 F. Supp. at 285.  To determine what amount of deference should have been given, "[t]he more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."  *Id.* at 286 (quoting *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001) (en banc)).  Time and time again, courts in the Second Circuit have recognized that a "valid reason" for bringing suit in the United States is "this country's interest in having

United States courts enforce United States securities laws." *Id.*; *see also In re Poseidon Concepts Sec. Litig.*, No. 13-CV-1213, 2016 WL 3017395, at *9 (S.D.N.Y. May 24, 2016) (plaintiff's choice to bring lawsuit in the U.S. was "entitled to significant deference," in part because the plaintiff's "claims [arose] under U.S. securities laws.").[8]  Thus, because foreign Defendants are alleged to have violated U.S. Securities laws, Plaintiffs have established the presumption that the United States is the proper forum for this suit.

### B.  The UAE Is Not an Adequate Alternative Forum

Defendants cannot rebut the presumption that the U.S. is the proper forum because they cannot show that the UAE is an "adequate alternative forum."  An adequate alternative forum is a necessary condition for a court's grant of a motion to dismiss for *forum non conveniens*.  *See In re Hub Cyber Security Ltd.,* No. 23-CV-5764, 2025 WL 872078, at *6 (S.D.N.Y. March 20, 2025). "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Id.* at *7 (citing *Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003)).  Defendants have shown neither: they have not established that they are amenable to service of process in the UAE, and they have not established that UAE permits litigation of U.S. securities laws.

*First*, Defendants have made no showing at all that they are amenable to service of process in the UAE; two of the four named Defendants are Bahrain-based entities, and one John Doe defendant is a United States-based Ernst & Young affiliate that participated in the PCAOB audit work.  *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01-cv-2946, 2002 WL 432390, at *7

---

[8] The Second Circuit has also recognized that "a plaintiff's U.S. citizenship and residence is entitled to consideration in favor of retaining jurisdiction."  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000).  Here, two out of the four Plaintiffs—Stephen Cannon and Bryant Edwards—are U.S. citizens.  Should the Court be inclined to dismiss this case based on *forum non conveniens* grounds, Plaintiffs respectfully seek leave to file a Second Amended Complaint stating the U.S. citizenship of these parties.

(S.D.N.Y. March 20, 2002) (holding that Norway was not an adequate available forum where "it is not at all clear that BONY would be subject to service of process in Norway").

**Second**, Defendants vaguely assert that UAE allows litigation of Plaintiffs' claims because they "sound in fraud." But Defendants ignore that two out of the three causes of action are claims arising under U.S. securities laws. Defendants "provide no explanation as to how plaintiffs could litigate [U.S. securities laws] claims in" the UAE. *In re Hub Cyber Security Ltd*, 2025 WL 872078, at *6 (denying motion to dismiss based on *forum non conveniens* because of claims brought under U.S. securities laws).

### C. The Balance of Public and Private Interests Favors the U.S.

The lack of an adequate, available forum is dispositive. But assuming *arguendo* that UAE were an adequate, available forum—and it is not—"a defendant does not carry the day simply by showing the existence of an adequate alternative forum." *Metito (Overseas) Ltd. v. General Elec. Co.*, No. 05-CV-9478, 2006 WL 3230301, at *4 (S.D.N.Y. Nov. 7, 2006). Defendants must *also* show that "both the private and public interest factors 'strongly' favor dismissal." *Id.* at *5 (citing *DiRienzo*, 294 F.3d at 30-31). "[O]nly if the chosen forum is shown to be genuinely inconvenient and the [alternative] forum significantly preferable" may the Court dismiss the case on *forum non conveniens* grounds. *Id.* (quoting *Iragorri*, 274 F.3d at 74-75). For the following reasons, Defendants have not remotely shown that the U.S. is a "genuinely inconvenient" forum and the UAE is a "significantly preferable" one.

#### 1. Defendants Have Not Shown That the Private Interest Factors "Strongly" Favor Dismissal

The private interest factors to be considered include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; . . . and all other practical problems that make trial of a case easy,

expeditious and inexpensive." *Metito*, 2006 WL 3230301, at *4 (quoting *Iragorri*, 274 F.3d at 73-74). Defendants fail to meet their burden to show that these factors "strongly favor" the UAE.

First, the vast majority of "the sources of proof" in this case will be the parties' electronic documents and emails; "the transmission of documents by electronic means is now instantaneous, inexpensive, and ubiquitous" and Defendants have not shown why it would be "significantly more burdensome" to send their documents to New York instead of the UAE. *Doe v. Kanakuk Ministries*, No. 3:11-CV-0524, 2012 WL 715980, at *3 (N. D. Tex. Mar. 5, 2012). Thus, this factor does not favor the UAE.

The second factor—availability of obtaining attendance of willing witnesses—likewise does not "strongly favor" the UAE; Defendants do not suggest that the sole named individual Defendant, O'Sullivan, would be unwilling or unable to appear in court or submit to a deposition. "Generally, a defendant must identify specific witnesses whose presence in New York would be difficult to secure in order to achieve dismissal on this ground"—and "[e]ven in such cases, the Second Circuit has recognized that there are alternative mechanisms for obtaining testimony from witnesses whose attendance at proceedings the Court is unable to compel." *Mucha*, 540 F. Supp. 3d at 290. Because Defendants have "not identified any witnesses who would be unwilling to appear in New York," this factor "does not weigh in favor of dismissal." *Id.*

Likewise, Defendants have failed to explain how the third factor—the "cost" of obtaining the attendance of willing witnesses—meaningfully favors UAE. Defendants have a significant New York presence[9] and several key players—including two potential *Doe* defendants—are located in the United States. *See* Am. Compl. ¶¶ 14; 15. And because Defendants have "vast resources and can therefore easily transport witnesses and evidence to" New York, this factor does

---

[9] https://www.ey.com/en_us/locations/united-states (reflecting four offices in New York City).

not favor dismissal.  *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 389 (S.D.N.Y. 2002); *see also Terra Sec. ASA Konkursbo*, 688 F. Supp. 2d 303, 317 (S.D.N.Y. 2010) ("Even assuming that a majority of the relevant evidence is in Europe, as Defendants contend, Defendants have offered no reason why transporting any evidence to New York would pose any significant hardship to the parties.").

### 2. Defendants Have Not Shown That the Public Factors "Strongly" Favor Dismissal

The Supreme Court has outlined four public interest factors to be weighed in the *forum non conveniens* inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the "local interest in having localized controversies decided at home;" and (4) avoiding difficult problems in conflict of laws and the application of foreign law.  *DiRienzo*, 294 F.3d. at 31 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Again, none of these factors *strongly* favor the UAE.

*First*, Defendants make no showing that "administrative difficulties" are more difficult in New York than the UAE.  *Second*, American jurors have an interest in this lawsuit because it "involves American securities markets" which—this Court has held—"establish[es] a clear relation to the community."  *Cyberscan Tech., Inc. v. Sema Ltd*., No. 06-CV-526, 2006 WL 3690651, at *13 (S.D.N.Y. Dec. 13, 2006).  *Third*, again, this case involves a "localized interest" in New York because it stems from U.S. securities markets, making this controversy, at least in part, local to this jurisdiction.  *See id*.  *Fourth*, this case involves the application of U.S. law, "so the complications of applying foreign law do not weigh in favor of dismissing the case."  *Kingdom 5-KR-41*, 2002 WL 432390, at *7.  In sum, Defendants have met *none* of the requisite factors to meet their "heavy burden" of overcoming Plaintiffs' choice of forum.  This case should remain in the United States.

## VI.    DEFENDANTS' PERSONAL JURISDICTION ARGUMENTS ARE MOOT

Finally, apparently conceding that because Section 10b-5 allows nationwide service of process this Court has personal jurisdiction over Defendants with respect to Plaintiffs' Section 10b-5 claims, Defendants have abandoned the argument pressed in their letter-motion that this Court lacks personal jurisdiction over Defendants entirely.  *See* MTD at 10.  Now, Defendants spend pages arguing that *if* this Court were to dismiss Plaintiffs' securities fraud claims, the Court would lack personal jurisdiction over Defendants' pendent fraud claim.  But that argument is moot in light of the Second Circuit's directive that "if all federal claims are dismissed before trial, the state claims should be dismissed as well." *Tracey Tooker & TT Ltd., Inc. v. Whitworth*, 212 F. Supp. 3d 429, 435 (S.D.N.Y. 2016) (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004)).  Thus, anticipating that this case will be remanded to state court in the event that the federal claims are dismissed, Plaintiffs do not address Defendants' personal jurisdiction arguments at length.  Suffice it to say that Plaintiffs meet all requirements for personal jurisdiction under New York law: they have "purposefully availed" themselves of the "privilege of conducting business in New York" under CPLR 302(a)(1), *see* Am. Compl. ¶¶ 53-66, and exercising personal jurisdiction over Defendants comports with constitutional due process.  *Nick v Schneider*, 2017 WL 2346699 (N.Y.A.D. 2 Dept. May 31, 2017).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. In the event that the Court is inclined to grant any portion thereof, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend.

Dated: September 8, 2025                    **AEGIS LAW GROUP LLP**


By: /s/ Serine Consolino
Serine Consolino (SC0525)
801 Pennsylvania Ave NW, Suite 740
Washington, D.C. 20004
Tel: 202-706-7031
sconsolino@aegislawgroup.com

*Counsel for Plaintiffs*


## Local Civil Rule 7.1 Certificate

I hereby certify that this Memorandum of Law contains 8362 words, including footnotes and endnotes, and as such, complies with the word-count limitations of Local Civil Rule 7.1.